IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE

FILED

September 7, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

FOR PUBLICATION

**Filed:**   September 7, 1999

| | | |
|---|---|---|
| DEMETRA LYREE PARKER, | ) | |
| | ) | |
| PLAINTIFF/APPELLEE, | ) | WARREN COUNTY CHANCERY |
| | ) | |
| v. | ) | Hon. John W. Rollins, Judge |
| | ) | |
| WARREN COUNTY UTILITY DISTRICT, | ) | No. 01S01-9806-CH-00107 |
| | ) | |
| DEFENDANT/APPELLANT. | ) | |

FOR APPELLANT:

LISA M. CARSON
Franklin

FOR APPELLEE:

ROBERT S. PETERS
Winchester

# O P I N I O N

COURT OF APPEALS AFFIRMED AS MODIFIED                    HOLDER, J.

**OPINION**

We granted review to address the standard for an employer's liability in supervisor sexual harassment cases under the Tennessee Human Rights Act following the recent United States Supreme Court's decisions in Burlington Indus. Inc. v. Ellerth, 118 S.Ct. 2257 (1998), and Faragher v. City of Boca Raton, 118 S.Ct. 2275 (1998). Upon review, we adopt a standard consistent with Ellerth and Faragher and hold that an employer is vicariously liable for sexual harassment by a supervisor. An employer, however, may raise an affirmative defense to liability or damages when no tangible employment action has been taken. The decision of the Court of Appeals is affirmed as modified.

**FACTS**

David Grissom worked as the general manager for the defendant, Warren County Utility District ("Utility District"). In 1988, Grissom hired the plaintiff, Demetra Lyree Parker, to work as a bookkeeper for the Utility District. In 1991 or 1992, the plaintiff notified her immediate supervisor, Pam Link, that Grissom was sexually harassing her. She alleged that Grissom's actions included touching her breast, attempting to kiss her, rubbing his body against hers, rubbing her legs and shoulders, commenting on the way her clothes fit her body, and whispering sexual remarks into her ear. Grissom further allegedly informed the plaintiff that "the solution to her problem was him" and that he "was a man" and "could take care of [her]."

Link apparently believed the plaintiff's allegations based on her own experiences with Grissom. Moreover, Grissom's alleged sexual harassment of the plaintiff was commonly discussed among the female employees in Link's office. Link asked the plaintiff what she wanted to do concerning the sexual

harassment. The plaintiff informed Link that she feared she would lose her job if she did anything. She, therefore, requested that Link do nothing. Link suggested to the plaintiff that she try to avoid Grissom and not dress in a manner that might cause him to sexually harass her.

Link did not initiate a formal complaint against Grissom on the plaintiff's behalf. Link's testimony indicates that she thought the Utility District had a grievance procedure. She, however, stated that to her knowledge the procedure was never explained either to her or to any of the Utility District's employees. Grissom testified that the Utility District did not have a sexual harassment policy when the alleged incidents of sexual harassment occurred. Grissom testified that the Utility District did not adopt a sexual harassment policy until October of 1994.

The plaintiff continued to convey to Link complaints of sexual harassment by Grissom that the plaintiff alleged occurred on almost a daily basis. Link discussed the plaintiff's allegations with Phillip Vinson, a member of the Utility District's Board of Commissioners. Link informed Vinson that the plaintiff did not "want anything done about [the harassment] because she's afraid she'll lose her job." According to Link, Vinson agreed that the plaintiff would probably lose her job if she pursued the allegations of sexual harassment.

Link spoke with Grissom about his treatment of the plaintiff. Grissom allegedly responded that the plaintiff had "done everything but lay [sic] down on the floor and take her clothes off in front of [him]." Link felt that additional conversation with Grissom concerning this matter would have been unproductive so she did not pursue the matter further.

In 1992 or 1993, the plaintiff discussed the alleged sexual harassment with Vinson. The plaintiff apparently conveyed to Vinson that she was concerned she would lose her job if she pursued the matter. Vinson did not assure the plaintiff that she would not lose her job. Vinson also replied that he represented only one vote on the Board and that he did not know how the other four commissioners would vote. The plaintiff asked Vinson not "to go to the Board with it because she felt that she would [lose] her job." Vinson did advise the plaintiff that she could pursue the matter legally if she felt "like [she had] a harassment case." Vinson neither discussed the matter with Grissom nor reported the plaintiff's allegation to other members of the Utility District's Board.

Grissom allegedly continued to sexually harass the plaintiff until Grissom voluntarily resigned in April of 1994. In the fall of 1994, the Board was considering rehiring Grissom as the Utility District's general manager. The plaintiff then notified the entire Board that Grissom had subjected her to sexual harassment and unwelcome sexual advances. The Board still voted to rehire Grissom, but the Board retained outside counsel to conduct an independent investigation into the plaintiff's allegations of sexual harassment. Plaintiff does not allege that Grissom sexually harassed her after he was rehired. The Board, however, suspended Grissom without pay as a result of the independent investigation into the allegations of sexual harassment.

In October of 1994, the plaintiff filed this action against Grissom, the Utility District, and two of its commissioners, Bobby Mayfield and Harrison Gant. The plaintiff asserted claims under both Title VII of the Civil Rights Act of 1964, 42

U.S.C § 2002e et seq.,[1] and the Tennessee Human Rights Act ("THRA"),[2] and asserted common law claims for negligent and intentional infliction of emotional distress. The plaintiff voluntarily dismissed without prejudice the claims against Bobby Mayfield and Harrison Gant and her claim under Title VII. The trial court subsequently entered an agreed order dismissing with prejudice the plaintiff's action against Grissom individually.

The plaintiff's claim before this Court is a claim under the THRA against the Utility District. The Utility District filed a motion for summary judgment alleging that it took prompt corrective action in response to plaintiff's complaints and that the corrective action was "a complete defense" to a claim for sexual harassment. The trial court granted the defendant's motion for summary judgment. The Court held that the Utility Board took "immediate steps" to "terminate the harassment" once "it received notice" of the harassment. The Court of Appeals reversed and held that "a genuine issue of material fact existed as to whether the Utility District responded promptly, adequately, and effectively to the plaintiff's informal complaints of sexual harassment." We granted the defendant's appeal.

**ANALYSIS**

This Court established a framework for analyzing sexual harassment cases under the THRA in Carr v. United Parcel Serv., 955 S.W.2d 832 (Tenn. 1997). In Carr, we recognized that our legislature had intended the THRA "to be

---

[1]Under Title VII of the Civil Rights Act of 1964, "it shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

[2]It is a discriminatory practice under the THRA for an employer to "[f]ail or refuse to hire or discharge any person or otherwise to discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's race, creed, color, religion, sex, age or national origin." Tenn. Code Ann. § 4-21-401(a).

coextensive with federal law." Id. at 834-35 citing Bennett v. Steiner-Liff Iron & Metal Co., 826 S.W.2d 119, 121 (Tenn. 1992); Tenn. Code Ann. § 4-21-101(a)(1) (1991 Repl.) (stating purpose and intent of general assembly was to "provide for execution of the policies embodied in the federal Civil Rights Acts of 1964, 1968 and 1972, . . ."). We, however, are neither bound by nor limited by the federal law when interpreting our state's anti-discrimination statute. Id. at 835. The policy of interpreting the THRA coextensively with Title VII is predicated upon a desire to maintain continuity between state and federal law.

Since our decision in Carr, the United States Supreme Court has modified the federal analysis for imposition of employer liability in cases involving supervisor sexual harassment. We shall begin by discussing our decision in Carr. Next we shall briefly examine the recent Supreme Court decisions articulating a standard for imposition of employer liability in cases involving supervisor sexual harassment. Finally, we shall examine the differences between Carr and the current federal law and address the facts of this case.

## SUPERVISOR HARASSMENT

In Carr, this Court adopted the federal courts' general analysis and delineated two general classes of supervisor harassment, quid pro quo and supervisor-created hostile work environment. In establishing the framework for analyzing a quid pro quo case, this Court utilized the Sixth Circuit Court of Appeal's test set forth in Kauffman v. Allied Signal, Inc., 970 F.2d 178, 186 (6th Cir. 1992). We held that under a quid pro quo theory of sexual harassment, a plaintiff must establish:

> (1) that the employee was a member of a protected class; (2) that the employee was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors; (3) that the harassment complained of was based on sex; (4) that the

6

employee's submission to the unwelcome advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to the supervisor's demands resulted in a tangible job detriment; and (5) the existence of respondeat superior liability.

Id. at 837 citing Kauffman v. Allied Signal, Inc., 970 F.2d at 186. Under the Carr analysis, an employer was strictly liable for quid pro quo sexual harassment. The theory of strict liability was imposed under the doctrine of respondeat superior and predicated upon the theory that: (1) a supervisor is the alter ego of the employer; and (2) a supervisor has the actual or apparent authority to alter an employee's terms or conditions of employment. Id. at 837; see generally Restatement of Agency § 219(1) ("A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.").

Unlike quid pro quo harassment, supervisors in supervisor-created hostile work environment cases do not make job benefits contingent upon the receipt of sexual favors. Carr, 955 S.W.2d at 838. The supervisor instead creates a hostile work environment. The Carr analysis for imposing employer liability for supervisor hostile work environment cases asked: "(1) whether the supervisor's harassing actions were foreseeable or fell within the scope of employment; and (2) even if they were, whether the employer responded adequately and effectively to negate liability." Id. at 838 quoting Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 803 (6th Cir. 1994). Accordingly, the employer's liability in a hostile work environment case was predicated upon its reaction to the supervisor's discriminatory conduct and not upon a theory of respondeat superior liability. Id.

7

**BURLINGTON INDUSTRIES, INC. V. ELLERTH**
**AND**
**FARAGHER V. CITY OF BOCA RATON**


Since our decision in <u>Carr</u>, the United States Supreme Court has revisited the area of employer liability for supervisor sexual harassment. In <u>Burlington Indus. Inc. v. Ellerth</u>, 118 S.Ct. 2257 (1998), and <u>Faragher v. City of Boca Raton</u>, 118 S.Ct. 2275 (1998), the Supreme Court enunciated a standard for imposing employer liability. Prior to these decisions, the Supreme Court had not clearly delineated a standard for imposing employer liability for supervisor sexual harassment under Title VII. The Court had previously acknowledged in <u>Meritor Savings Bank, FSB v. Vinson</u>, 477 U.S. 57 (1986), that hostile work environment and quid pro quo harassment constituted violations of Title VII. In <u>Meritor</u>, however, the Court did not articulate a precise standard for imposing employer liability but did suggest that lower courts should look to agency principles when defining liability for supervisor sexual harassment.


<u>Faragher v. City of Boca Raton</u>


In <u>Faragher</u>, the plaintiff worked part-time as a lifeguard for the defendant from approximately 1985 to 1990. She alleged that her supervisors subjected her to a "sexually hostile atmosphere." Her allegations included sexually offensive comments and unwanted touchings from two of her supervisors, Silverman and Terry.


Faragher spoke informally with one of her supervisors, Gordon, but she did not initiate a formal complaint to upper management. <u>Faragher</u>, 118 S.Ct. at 2281. She left her job as a lifeguard in 1990. The City remained unaware of the alleged sexual harassment until April of 1990 when one of Faragher's co-workers complained of sexual harassment in a letter to the City's Director of Personnel.

8

The City investigated the complaint and reprimanded the harassing supervisors. Faragher initiated suit in 1992 alleging violations of Title VII.

The City of Boca Raton had adopted an anti-sexual harassment policy in 1986. Id. at 2280. Although the 1986 policy was addressed to all City employees, the policy was issued only to a portion of the City employees. The City revised and reissued the policy in 1990. Id. The revised policy detailed the City's policy against sexual harassment. Id. at 2281, 2294. The policy was not properly disseminated, and Faragher's supervisors were unaware of the anti-harassment policy prior to litigation.

The district court ruled that the City was liable for sexual harassment because: (1) the City had "knowledge or constructive knowledge" of the harassment; (2) the harassing supervisors were acting as agents of the City; and (3) Gordon's knowledge of the sexual harassment could be imputed to the City. The Eleventh Circuit Court of Appeals reversed the district court's holding that the City was liable. The Eleventh Circuit reasoned that the supervisors' acts of sexual harassment were outside the scope of employment and that their conduct was not aided by the agency relationship. Id. at 2281. The Supreme Court granted certiorari.

<u>Burlington Industries, Inc. v. Ellerth</u>

Ellerth was employed by Burlington as a salesperson for approximately one year. Ellerth's immediate supervisor reported to Slowik. Ellerth alleged that Slowik subjected her to sexual harassment. Her allegations included "repeated boorish and offensive remarks and gestures." Ellerth, 118 S.Ct. at 2262. First, she claimed that Slowik made comments concerning her breasts and told her that he could "make [her] life very hard or very easy at Burlington." Id. Second,

9

she maintained that Slowik informed her she was not "loose enough" and rubbed her knee during an interview for a promotion. Id. Finally, she alleged that Slowik told her during a telephone conversation that her job would be easier if she wore shorter skirts. Id.

Burlington's policy against sexual harassment was contained in the employee's handbook. Ellerth had received the employee's handbook and was aware of the policy. She, however, never complained to anyone in authority concerning her allegations against Slowik. She later quit her job. Id. at 2262-63.

Ellerth filed suit in the district court under Title VII alleging sexual harassment and constructive discharge. The district court granted summary judgment to Burlington holding that Burlington "neither knew or should have known" about Slowik's behavior because Ellerth failed to use Burlington's grievance procedures. Id. at 2263. The Seventh Circuit Court of Appeals reversed the district court's grant of summary judgment. The Seventh Circuit sitting en banc issued eight separate opinions with no consensus for a controlling rationale of the standard for employer liability. The majority of the Seventh Circuit, however, did categorize Ellerth's claim as quid pro quo harassment but failed to agree on whether to apply a standard of negligence or vicarious liability.

<u>Supreme Court's Holdings in Faragher and Ellerth</u>

The Supreme Court granted certiorari in <u>Faragher</u> and <u>Ellerth</u> to define the standard for imposing employer liability in supervisor sexual harassment cases. In <u>Ellerth</u>, the Court was asked to decide "whether an employee who refuses unwelcome and threatening sexual advances by a supervisor but suffers no adverse job consequences can recover against the employer without showing that the employer was negligent or otherwise at fault." Id. at 2262. In <u>Faragher</u>,

the Court sought to identify "the circumstances under which an employer may be held liable under Title VII" for supervisor-created hostile work environment found to be sexual harassment. Faragher, 118 S.Ct. at 2280.

The Supreme Court held that employers are vicariously liable for all forms of supervisor sexual harassment actionable under Title VII regardless of whether the conduct constitutes quid pro quo sexual harassment or hostile work environment sexual harassment. The Court rejected the argument that the scope of employment was the only basis for defining employer liability. The Court looked generally to the Restatement of Agency § 219(2)(d)[3] and held that:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, . . . The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise . . . . No affirmative defense is available, however, when the supervisor's sexual harassment culminates in a tangible employment action . . . .

Faragher, 118 S.Ct. at 2292-93; Ellerth, 118 S.Ct. at 2270. Accordingly, an employer may now avoid liability for supervisor sexual harassment under Title VII only when: (1) a tangible employment action has not occurred; and (2) the

---

[3]The Restatement of Agency § 219(2) provides:

A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
> (a) the master intended the conduct of the consequences, or
> (b) the master was negligent or reckless, or
> (c) the conduct violated a non-delegable duty of the master, or
> (d) the servant purported to act or to speak on behalf of the principal and there was reliance upon the apparent authority, or he was aided in accomplishing the tort by the existence of the agency relationship.

employer establishes by a preponderance of the evidence that it meets the required elements of the affirmative defense.

Under the newly enunciated standard, the Court reversed the Eleventh Circuit in Faragher and held that the City of Boca Raton was vicariously liable for the supervisor-created hostile work environment found by the district court. The Court found that Faragher did not experience a tangible employment action. The Court, therefore, analyzed whether the City could establish the affirmative defense. The Court held that, based upon the findings of the trial court, the City failed to exercise reasonable care to prevent the sexual harassment and was unable to avail itself of the affirmative defense. Faragher, 118 S.Ct. at 2293.

Similarly, the Court held in Ellerth that Burlington was vicariously liable for Slowik's conduct in creating a hostile work environment. Ellerth did not sustain a tangible job loss, so the affirmative defense was available to Burlington. The Court remanded Ellerth to afford Burlington the opportunity to establish the affirmative defense.

## IMPACT OF FARAGHER AND ELLERTH ON CARR

Carr is now inconsistent with federal law on supervisor sexual harassment following the recent Supreme Court decisions. Carr employed the pre-Faragher and pre-Ellerth separate categories of quid pro quo and supervisor-created hostile work environment. In Carr, an employer's liability was premised upon a standard of negligence for supervisor-created hostile work environment and upon vicarious liability for quid pro quo harassment. While the terms quid pro quo and hostile work environment are no longer relevant under the federal analysis when determining the employer's standard of liability under Title VII, the terms are relevant for illustrating "the distinction between cases involving a threat

12

which is carried out and offensive conduct in general." Ellerth, 118 S.Ct. at 2265. The terms retain further relevance "when there is a threshold question whether a plaintiff can prove discrimination in violation of Title VII." Id.

The legislature's stated purpose in codifying the THRA was to prohibit discrimination in a manner consistent with "the federal Civil Rights Acts of 1964, 1968, and 1972, . . . ." Tenn. Code Ann. § 4-21-101(a)(1), -101(a)(2). Accordingly, we hold that the stated purpose behind the enactment of our THRA will be best served by maintaining continuity between our state law and the federal law on the issue of imposing employer liability for supervisor sexual harassment. We, therefore, adopt the Supreme Court's recently articulated standard of vicarious liability in all supervisor sexual harassment cases.

We hold that, under the THRA, an employer is subject to vicarious liability to a victimized employee for actionable hostile work environment sexual harassment by a supervisor with immediate (or successively higher) authority over the employee. The defending employer may raise an affirmative defense to liability or damages when no tangible employment action has been taken. The affirmative defense is comprised of two necessary elements: (1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or that the employee unreasonably failed to otherwise avoid the harm. The affirmative defense shall not be available to the employer when the supervisor's sexual harassment has culminated in a tangible employment action. Our decision in Carr is thus modified to reflect the above standard recently articulated by the United States Supreme Court, and Carr is overruled only to the extent that the decision is inconsistent with the above standard.

13

**APPLICATION TO FACTS**

The Utility District argues that it is not liable and is entitled to summary judgment because the harassing supervisor did not act within the scope of his employment. Section 219(1) of the Restatement of Agency states that employers are liable for the torts committed by employees "while acting in the scope of their employment." The Supreme Court in Faragher lamented that the phrase "scope of employment" provided little guidance and held that § 219(1) does not serve as the sole basis for imposing employer liability. We have adopted the Supreme Court's vicarious liability standard, and the defendant's assertion is inconsistent with the adoption of that standard. See generally Restatement of Agency § 219(2)(d). Accordingly, we hold that the defendant would be vicariously liable for Grissom's alleged sexual harassment.

We shall next examine whether the plaintiff was subject to a tangible employment action. The plaintiff alleges in her complaint that she "received less money than she would have received except that she has not complied with David Grissom's demands and requests . . ." The plaintiff also contends that she was the "lowest paid office employee." The record reflects that the plaintiff continued to work for the defendant at the time the lawsuit was initiated. She occupied the same position she had attained two months after she began her employment with the defendant. She apparently received the maximum pay rate for her position, received annual cost of living increases, and received some merit raises. The record in this case is insufficient to show that the plaintiff has suffered a tangible employment action. The defendant, therefore, is entitled to raise the affirmative defense under the current facts.

The affirmative defense requires the defendant to establish both: (1) that it exercised reasonable care to prevent and correct the harassing behavior; and

(2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or that the employee unreasonably failed to otherwise avoid the harm. The facts in this case are similar to those in Faragher. The plaintiff discussed Grissom's sexual harassment with her supervisor, Link. She, like Faragher, never initiated a formal complaint. The harassment in both cases continued for several years even though both plaintiffs complained of the harassment informally to supervisors. Both employers alleged they were unaware of the harassment because the plaintiffs never initiated formal complaints. The Utility District appears to allege that it had a sexual harassment policy in place when the alleged harassment occurred. A specific anti-sexual harassment policy, however, has not been brought to this Court's attention. Moreover, if an anti-sexual harassment policy had been in existence at the time of the alleged harassment, the Utility District apparently failed to properly disseminate the policy. Link testified that she thought the Utility District had a grievance procedure but that to her knowledge the procedure was never explained to her or to any other Utility District employees. Grissom, however, testified that a policy against sexual harassment was not in force when the alleged harassment occurred.

The record currently before us is devoid of evidence to support a finding that the Utility District exercised reasonable care to prevent the alleged sexual harassment. Moreover, the Utility District has failed to either establish the presence of a written anti-discrimination policy that was properly disseminated to its employees or establish the presence of a policy suitable to deal with the employment circumstances of this case.

The trial court's decision to grant the defendant's motion for summary judgment is reversed. The case is remanded to the trial court for further action

15

consistent with this opinion. We have modified our decision in <u>Carr</u> to reflect the recently articulated standard for supervisor harassment adopted by the United States Supreme Court. As stated above, the defendant cannot establish the affirmative defense on this record. On remand, however, the Utility District shall be afforded the opportunity to assert facts that may establish the elements of the affirmative defense that we have adopted today. Cost of this appeal shall be taxed against the Utility District for which execution may issue if necessary.

_____
JANICE M. HOLDER, JUSTICE

**Concurring:**

Anderson, C.J.
Drowota, Birch, and Barker, J.J.