FILED

05/30/2017

Clerk of the
Appellate Courts

# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
January 18, 2017 Session

## TYSHEKA BARNETT v. B.F. NASHVILLE, INC. DBA WENDY'S OF NASHVILLE

**Appeal from the Circuit Court for Davidson County**
**No. 14C3213      Joseph P. Binkley, Jr., Judge**

---

### No. M2016-00762-COA-R3-CV

---

Tysheka Barnett brought this action solely against her employer, B.F. Nashville, Inc., dba Wendy's of Nashville, alleging that Wendy's general manager, William Rogers, sexually harrassed her during her employment at a Wendy's restaurant. After a four-day bench trial, the court found that plaintiff had not met her burden of proof to show that the sexual conduct between her and Rogers was unwanted, and, therefore, she was unable to show harassment. On appeal, plaintiff primarily argues that the evidence preponderates against the trial court's determination that the sexual interaction in question was not unwelcomed by plaintiff. This ruling was driven and determined in large part by the trial court's evaluation of the credibility, including demeanor, of the various witnesses. Plaintiff appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

Stephen Crofford and Mary Parker, Nashville, Tennessee, for the appellant, Tysheka Barnett.

Richard C. Mangelsdorf, Jr. and Brian F. Walthart, Nashville, Tennessee, for the appellee, B.F. Nashville, Inc.

# OPINION

## I.

Plaintiff began working at Wendy's restaurant on Jefferson Street in Nashville in late September of 2013. She was a freshman at Tennessee State University. The Wendy's, located near the TSU campus, was referred to by the parties as the "TSU Wendy's." Plaintiff testified that she was getting lunch there one day when the general manager, Rogers, asked her if she wanted a job. Rogers denied this; he testified that plaintiff "came down there numerous times, filling out application[s], two or three of them, and I finally interviewed her and gave her a job."

Plaintiff alleged that manager Rogers began making sexual advances to her on the first day of her employment. She testified that Rogers "was saying he wants me like he wanted me like maybe as his girlfriend or he wanted to have sex with me or do sexual activity with me." Plaintiff stated that his conduct got progressively more aggressive over the first several months, and that he made graphic sexual comments to her and groped her on "several different occasions." By December 2013, according to plaintiff's testimony, Rogers was threatening to cut her working hours if she continued to refuse sex with him. When she was asked why she continued to work at the TSU Wendy's, plaintiff said that she was unable to find another job because she was then on probation for simple possession of marijuana.

Rogers flatly denied the allegations of sexual harassment. He testified that plaintiff "was a real touchy person. She hugged and kissed, stuff on everybody." He also said that plaintiff regularly called him on his cell phone when neither of them was at work. In late January or early February of 2014, plaintiff and Rogers met at a hotel room and had sex. She testified that she felt compelled to do it because he was beginning to carry out his threat of cutting her hours; those hours declined in mid-December. He testified that it was purely a sex-for-money exchange, and that they had negotiated the price a couple of nights before. Rogers said plaintiff wanted $400 and they agreed on that price, but at the hotel room he only had $260, which he paid her upfront. Plaintiff admitted that Rogers gave her $260 in the hotel room. She testified at one point that the money was to help her catch up on her overdue bills and to make up for lost hours, and also testified that the money was a "gift."

Plaintiff continued to work at the TSU Wendy's for the first half of 2014. Her hours remained steady until the end of June, when they began to decrease. Plaintiff testified that Rogers cut her hours because she refused his sexual advances after the hotel encounter. Many of the other witnesses testified that plaintiff got fewer hours because she was then working a second job that required her to leave the TSU Wendy's early.

The testimony of these witnesses, which included co-workers and assistant managers, will be discussed later in greater detail.

On July 27, 2014, plaintiff reported to work early, before the restaurant opened, and surreptitiously recorded an interaction between her and Rogers on her cell phone. The recording is a videotape file, but only audio is available during the pertinent times. This is because the phone's video camera was apparently covered up and the file shows only a black screen for most of the recording. On the recording, plaintiff is heard to say, "boy, if you don't get your hands out of my damn pants" and "so you really not gonna take your hands out of my pants, huh?" Rogers then asks plaintiff to go to the ladies' bathroom and strip for him for $40. According to Rogers, she did, and he paid her $20. According to plaintiff, she refused. The recording is barely audible at points, and difficult to understand throughout. The trial court found that "Rogers said she said . . . that she would strip for $40, and I think the tape said that, said, 'Yeah, I'll do that.' " The evidence does not preponderate against this finding. On the recording, it sounds like plaintiff said "I'll strip for you . . . I'll strip for them forty."

Nine days later, on August 5, 2014, plaintiff filed this action against BF Nashville, Inc. (employer), the owner of the TSU Wendy's. She alleged employer was vicariously liable under the respondeat superior doctrine for Rogers' alleged sexual harassment of her, said conduct being in violation of the Tennessee Human Rights Act (THRA), Tenn. Code Ann. § 4-21-101 *et seq.* (2015). Three of employer's executive-level managers testified: district manager Bobby Moss, human resources manager Dale Bruner, and director of operations Charles Pastors. All three testified that the first time they heard of the harassment allegation was upon receipt of the notice of the lawsuit.

On August 7, 2014, two days after the complaint was filed, all three executives traveled to the TSU Wendy's and conducted an investigation comprised of employee interviews. They took the statements of some fifteen employees, recording their answers to seven pertinent questions on a written sheet, allowing employees to write their own statements, and having the employees sign the statements. The executives began with William Rogers, who initially denied the allegation of harassment, saying "none of it's true." The investigation did not develop any corroborating evidence suggesting any other employee's awareness or perception of sexual harassment of anyone by Rogers. At the end of the first day of the investigation, Rogers came forward to human resources manager Bruner and district manager Moss, and told them about the incident in the ladies' bathroom, saying that he followed plaintiff in there and she dropped her pants in return for money. They asked him to put his statement in writing, which he did. Then they took his restaurant keys, and asked him to leave. He never returned to the restaurant in an employment capacity.

Employer officially fired Rogers several days later. It is not entirely clear from the record when Rogers became aware of the tape recording. It appears, however, that it was at this meeting when Bruner and Pastors told him they were terminating his employment. After Rogers learned he was fired, he told the executives that he and plaintiff had met at a hotel room and had sex, saying it was consensual and that he had paid her money.

The case proceeded to a bench trial, which was conducted on January 11 through 14, 2016. The court heard closing arguments and delivered its opinion from the bench on January 27, 2016. The trial court held that plaintiff failed to meet her burden of proof to demonstrate that the sexual contact between her and Rogers was unwanted. The court concluded, therefore, that no harassment had been demonstrated. Additionally, and alternatively, the trial court found that employer established its affirmative defense by showing that "if, in fact, it was unwelcomed conduct, and I find that it was not unwelcomed, that the employer exercised reasonable care to prevent and correct properly any sexual harassing behavior." The court further stated, "the record is abundantly clear that the plaintiff had no desire to take advantage of the preventive or corrective opportunities provided by the employer to report sexual harassment," and, "I found there's no harm, but if there was harm, I find that [plaintiff] unreasonably failed to otherwise avoid the harm and, in fact, invited the sexual contact." Plaintiff timely filed a notice of appeal.

## II.

Plaintiff raises the following issues, as paraphrased by us:

> 1. Whether the trial court complied with Tenn. R. Civ. P. 52.01, which requires that the court "shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment," when it delivered its seven-hour, 185-page oral opinion from the bench.
>
> 2. Whether the evidence preponderates against the trial court's finding that plaintiff failed to carry her burden of proving that the sexual interactions between plaintiff and Rogers were unwelcomed.
>
> 3. Whether the trial court erred in admitting Charles Pastors' testimony regarding certain specific instances of plaintiff's

conduct related to him by other Wendy's employees, said testimony being offered under Tenn. R. Evid. 405(b).

4. Whether the trial court erred in holding that employer was entitled to present its affirmative defense that it took reasonable measures to prevent and correct discriminatory conduct, and that plaintiff unreasonably failed to take advantage of these preventative and corrective measures.

5. Whether the trial court erred in granting employer's motions in limine to exclude evidence of a prior sexual harassment lawsuit filed against employer that did not involve the TSU Wendy's or any of its employees, and to exclude evidence of Rogers' prior consensual sexual relationship with another subordinate employee.

### III.

In this non-jury case, our standard of review is de novo upon the record of the proceedings below; however, the record comes to us with a presumption of correctness as to the trial court's factual determinations, a presumption we must honor unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn. 1995). There is no presumption of correctness as to the trial court's legal conclusions. *Kendrick v. Shoemake*, 90 S.W.3d 566, 569 (Tenn. 2002); *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996).

### IV.

### A.

Plaintiff argues that the trial court did not comply with Tenn. R. Civ. P. 52.01, which requires, in pertinent part, as follows:

> In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment. . . . If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein.

The trial court's final judgment dismissing the action with prejudice stated as follows in pertinent part:

> The Court issued an oral ruling from the bench. . . . This Court expressly adopts by reference, and incorporates by reference, all of . . . the Court's findings of fact and conclusions of law contained in Exhibit A. However, to summarize, after reviewing all of the evidence, authority, and argument submitted by the parties, this Court finds that Plaintiff Barnett failed to meet her burden of proof to show that she suffered any sexual harassment as defined by law, or other violation under the Tennessee Human Rights Act. Furthermore, even assuming that Plaintiff did suffer some form of sexual harassment/discrimination while employed by the Defendant, this Court finds that Defendant B.F. Nashville, Inc. has fulfilled its burden of proof and proved all of the elements of the affirmative defense set forth in ***Parker v. Warren County Util. Dist.***, 2 S.W.3d 170, 176 (Tenn. 1999). For these reasons the Plaintiff's complaint is hereby dismissed with prejudice.

In its oral opinion, the trial court reviewed the testimony of all eleven witnesses and many of the trial exhibits, making numerous specific findings regarding the credibility of the various witnesses. The court was very thorough. Its transcribed opinion is 185 pages long. The time stamps on the transcript show that the trial court began delivering its opinion at 3:00pm and concluded at 10:09pm. We find no merit to plaintiff's argument that the trial court failed to comply with Rule 52.01.

**B.**

The THRA provides that "[i]t is a discriminatory practice for an employer to: (1) Fail or refuse to hire or discharge any person or otherwise to discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's race, creed, color, religion, sex, age or national origin." Tenn. Code Ann. § 4-21-401(a) (2015). It is well established that the THRA bars sexual harassment in the workplace, ***Campbell***, 919 S.W.2d at 31, as does the similarly-worded Title VII of the Federal Civil Rights Act. ***Id***; ***Parker v. Warren Cnty. Util. Dist.***, 2 S.W.3d 170, 172 (Tenn. 1999); ***Allen v. McPhee***, 240 S.W.3d 803, 812 (Tenn. 2007), abrogated on other grounds by ***Gossett v. Tractor Supply Co.***, 320 S.W.3d 777 (Tenn. 2010).

In *Gordon v. W.E. Stephens Mfg. Co.*, No. M2007-01126-COA-R3-CV, 2008 WL 4254584, at *6 (Tenn. Ct. App., filed Sept. 16, 2008), we observed that "[w]hile there can be no uniform definition of sexual harassment, it can include *unwelcome* sexual advances, requests for sexual favors, *or any unwelcome conduct*, whether verbal or physical, which would not likely take place but for the plaintiff's gender." *Id.* (citing *Campbell*, 919 S.W.2d at 31 (emphasis added)).

Plaintiff argues that the evidence preponderates against the trial court's conclusion that the sexual contact between her and Rogers was not unwelcomed. As might be expected, her testimony is diametrically opposed, in many regards, to that of Rogers. Rogers' testimony was successfully impeached on several occasions, and he admitted having lied more than once in an attempt to save his job. The trial court also heard the testimony of two of plaintiff's co-workers, Cameo Owens and Sidney Robinson, and generally credited that testimony. Two assistant managers, Marjorie Ann Martin and Rashleigh Braithwaite, also testified.

Plaintiff testified that Rogers harassed her "constantly, the whole time I was there from the first day[.]" She said that the harassment occurred almost every day that she worked at the TSU Wendy's. The trial court noted that no other witness corroborated this allegation. Plaintiff answered "correct" when she was asked, "it's your testimony . . . that you were being harassed by your manager at work but no one else in the restaurant even knew about it except you and him; is that right?" Plaintiff further testified as follows:

> Q. Okay. And the truth of the matter is, ma'am, with all due respect, you were in close proximity to all these co-workers, sometimes as many as 12 other people working with you on a shift for six hours at a time?
>
> *       *       *
>
> A. Yeah. They're just people, people I don't know. . . . I'm not going to tell them my personal information because that's just like walking up to a total stranger.
>
> Q. And during these six-hour shifts, you would sometimes even bump into other people because you're just working in such close quarters; right?
>
> A. I guess you could say. I mean, if there's 12 people working a compact area, I'm pretty sure.

Plaintiff said that the reason no one else at the restaurant observed any harassing behavior is that Rogers would call her in early when no one else was working "and get me alone when there's no cameras."

Co-worker Owens' testimony contradicted this statement. She testified that plaintiff's usual morning shift began at 10:00 or 10:30am. Owens' normal shift started at 7:00am, and did not fluctuate. Owens testified that plaintiff was never already at the Wendy's when Owens got there. She also said that she never discovered that plaintiff had been in the store alone with Rogers when Owens reported to work at 7:00.

Owens testified that she never saw anything that she considered sexual harassment at the TSU Wendy's, nor did she ever hear anyone complain about such harassment. In response to a question of whether plaintiff ever did "anything sexually suggestive" to her, she stated that while they were working together, plaintiff "would touch me and say I want you, or I like you." Owens testified that plaintiff did not "seem like the kind of person that was hesitant to share personal details." She said that plaintiff told her about the hotel incident while they were at work, stating:

> A: She said promise you ain't gonna tell nobody. . . . I said ain't gonna tell, Tysheka. She said, okay, I'm fixin' to tell you, and then she said she had sex with Mr. [Rogers].
>
> *     *     *
>
> Q. Okay. Tell me the details that she gave you about the sexual contact.
>
> A. She said she had sex with Mr. [Rogers] in a room for $500.
>
> Q. Okay. Did she seem upset or sad when she told you this?
>
> A. No, sir.
>
> Q. Can you describe for the Court [plaintiff's] demeanor when she told you this?
>
> A. She told me like she was all right with it, like she was confident, like she didn't have no problems. She was just – she needed some money to take care of a bill or her car.

When plaintiff was asked if she ever told Owens that she had sex with Rogers for money, she responded, "I absolutely do not remember . . . I mean, it's possible it could have happened." The trial court specifically found Owens' testimony to be credible.

Sidney Robinson, another co-worker who started working there her junior year in high school and was no longer working there at time of trial, testified that she was never harassed at the TSU Wendy's. She said she felt like she would be protected if that had happened, because of the "good managers that we have" that "followed the [sexual harassment] policy." Robinson never saw Rogers interact inappropriately with plaintiff or anyone else. She also stated that she was unaware of "any discussion or rumor" among the employees that sexual harassment was occurring at the restaurant. When she was asked, "in the restaurant where Mr. Rogers was the boss, did you see any evidence in the restaurant of a hostile environment for women?" she replied "no." Robinson initially testified that she overheard plaintiff "on the line bragging about" selling her body for cash. She later retreated from this statement, recanting that she had heard plaintiff say she sold her body "for cash" and testifying that plaintiff "does certain things . . . trying to hit on somebody in a . . . blurred way." The trial court specifically credited Robinson's testimony.

Marjorie Ann Martin, an assistant manager, also testified. She was unaware of any sexual harassment complaint that any Wendy's employee had made prior to this lawsuit. She testified that Rogers was a good manager who took care of his employees, that she never witnessed or heard of any harassment by Rogers, and that she was shocked when she heard of plaintiff's allegation. Martin worked the night shift with plaintiff for a fairly brief time. She testified as follows about her interaction with plaintiff:

> Q. Did [plaintiff] have any problem with sharing personal information with you at the workplace?
>
> A. No, sir, she did not.
>
> Q. Did she have any problem sharing information with you about her personal relationships?
>
> A. No, sir, she did not.
>
> Q. Did she seem hesitant to talk about private matters such as her relationships with men?
>
> A. Let's just say she talked about it a lot.

Q. Well, why don't you explain what you mean by that?

A. Okay. [Plaintiff] had this tendency to – let's just say, sexual harassment from Mr. William Rogers may be an extreme. It might be sexual harassment – sexual harassment from [plaintiff].

Q. What do you mean?

A. [Plaintiff] would say things to me and to other employees which made me have to stop her from saying because it got too offensive.

Assistant manager Martin also related to the trial court an incident where plaintiff described "an idea" to sue another manager at an Arby's restaurant where she also worked for racial harassment:

A. [Plaintiff] bragged about how she had the boss wrapped around her finger. She could get her way from him – get her way from him is what she said. [Plaintiff] started to work nights with me. She kept saying how bad she needed money. She told me she came up with this idea. She said the manager at Arby's was mistreating her. She said the manager was white and thought she was racially harassing her. I told her – told her to talk to the manager and the GM. I also told her to file a lawsuit based on something that was – that's not there is wrong. She also said she was arrested for possession of a pound of Mary Jane.

The trial court found Martin's testimony to be credible.

In late January or early February – neither was sure of the date – plaintiff and Rogers met at a hotel and had sex. Plaintiff adamantly denied that it was a money-for-sex exchange. She testified, "[t]he money he gave me was a gift. Since he cut my hours and as a result of him cutting my hours, like I said before, he would help me get caught up on my expenses." On cross-examination, plaintiff admitted that she testified in her deposition as follows:

Q. Okay. Page 116. I'd like you to look, ma'am, here at line 5. Question: "You said he gave you money. Did he give you some money as a gift?" Answer: "I mean, he gave me some

money." "How much money did he give you?" "He gave me, I believe it was, like, 400. And then he told me that one day when I come to work, don't clock out, that he would pay me on the clock." Is that what he told you?

A. Yes, sir.

* * *

Q. Question: "Did he pay you to have sex with him?" Why don't you read the Court your answer, please?

A. I mean, he gave me some cash. He paid me.

Q. You said, "Yes, he paid me." Correct?

A. I mean, it says, "Yes, he paid me." But from my understanding, he did not give me any cash for sex.

Rogers, for his part, testified that plaintiff regularly called him on his cell phone when neither of them was at work, they talked frequently, and they agreed on a price before they went to the hotel. Although plaintiff wanted $400 and they agreed on that amount, he only had $260 on the date they met, so they settled on that price. Rogers testified, "I never sexually harassed her. I paid her for her services, and that was it." The trial court found as follows:

> [Plaintiff] testified she did not have sex with William Rogers for money in a motel. I understand what you mean by that, saying she wasn't being a prostitute, but she was – had sex because she needed the money. I mean, I get the distinction there in her mind, I get what she is talking about, but it leads me to the conclusion that it was not unwelcomed sexual contact, it was welcomed.

The trial court also found it credible that plaintiff, "after having sex with William Rogers . . . at the hotel, motel, that she felt disgusted with herself for having done that," stating, "I do think that following that encounter with a man the age of her father who's way overweight, not clean, smelled, that she was disgusted."

Plaintiff testified that she felt compelled to give in to Rogers' sexual advances because he threatened to cut her working hours, and in fact did so when she refused him.

Rogers denied ever manipulating her hours, either as a threat or a reward. The parties presented detailed records of the hours plaintiff worked at the TSU Wendy's, from late September 2013 until the week ending August 10, 2014. Her hours fluctuated somewhat each week, but mostly stayed between 25 and 35 hours per week. They dropped for two weeks in mid-December. For the week ending December 15, 2013, she worked 14.93 hours, and the week ending December 22, only 5.63 hours. Many of the Wendy's employees testified that after TSU's final exam period ended and Christmas break began, it was a very slow time for the restaurant and everyone had their hours cut for that reason. This potentially explains the drop in hours for the second week, because TSU's commencement was on December 14. There was no explanation provided for why plaintiff got fewer hours for the week ending December 15. However, in plaintiff's answer to interrogatories asking her to list each alleged instance of retaliation by having hours cut, she did not include the dates in December in her response, citing only her drop in hours that occurred in mid-2014. Employer cross-examined her on this omission, asking, "could you show the Court if there is anywhere in your interrogatory responses where you allege that your hours were cut in December of 2014?" [*sic*: 2013] Plaintiff's counsel replied, "we will stipulate there is not." The record further shows that plaintiff also worked at Arby's from September 2013 until April 2014, and that she worked 30.28 hours at Arby's during the week ending December 22, 2013.

Plaintiff's hours generally returned to normal, both before and after the hotel incident, until the end of June 2014. They declined significantly in July; she worked around seven hours per week that month. Plaintiff testified that Rogers cut her hours in retaliation for her refusal to have sex with him again. Numerous other witnesses, including co-workers Owens and Robinson, assistant managers Martin and Braithwaite, and Rogers, testified that the reason plaintiff got fewer hours was that she was then working a second job in Smyrna that required her to leave the TSU Wendy's earlier than before. Additionally, it was undisputed that plaintiff was also picking up hours on an "as-needed" basis from another Wendy's store located on Charlotte Pike in Nashville. Robinson testified as follows:

> Q. What did – and what did she say to you about the second job?
>
> A. . . . I asked her, well, why don't I see you because I had just came back from – from school, just came back to Wendy's. She said, well, I have another job so I'm not there as much.

*     *     *

Q. Did [plaintiff] ever tell you why she thought her hours were being reduced at the TSU Wendy's?

A. I asked her why I don't work with her a lot, and she told me that she had a second job.

The trial court found as follows regarding plaintiff's work hours:

I find that her hours were cut at TSU Wendy's because she had a second job and she had to get out of there early in order to get to Smyrna to be involved in her second job. It had nothing to do with failure to give sexual favors. It had everything to do with the fact she had to be at another job.

This conclusion was based largely on the trial court's observation of the various witnesses and assessment of their credibility. The evidence does not preponderate against the trial court's findings of fact supporting its ultimate conclusion on this point.

Plaintiff recorded her interaction with Rogers on July 27, 2014, which happened before the restaurant opened. As already noted, Rogers asks plaintiff to go to the ladies' rest room and strip for him for $40. Plaintiff testified, "he gave me nothing, and I did not strip for him." Rogers testified, "I told her, 'as a matter of fact, you can strip for me right now for $40," and she said, 'okay,' " and "I ended up giving her $20." The trial court correctly noted that it sounds like plaintiff agreed with the suggestion on the recording. Plaintiff did not deny her agreement on cross-examination. She testified:

Q. And the truth is you agreed to go to the bathroom with him for $40 because you were trying to trap him for a lawsuit; is that right?

A. No. He trapped himself. He knew for a fact he wasn't supposed to fraternize or do anything with your coworkers, and he did not once, twice.

Q. Well, explain to the Court then why you said you would go to the bathroom and strip for him for $40, what was in your mind?

A. It would – it wouldn't have been trapping him. I mean, this is a lawsuit. You need evidence. You need facts. You need facts. If I would have came to my lawyer with nothing,

it would have been my case against his; he say versus she say. Don't you believe you need the facts to prove the case?

Rogers testified to the effect that plaintiff set him up to get the recording, stating in pertinent part:

Q. The conduct between you and [plaintiff], that you weren't surprised by the tape recording?

A. I mean, I was surprised that she made the tape recording, yes.

Q. But the fact that you all were talking in that manner, was not –

A. No.  I was on the phone with her all the time.

Q. That wasn't inconsistent with the way you talked in the store?

A. No.  Because we never really – she never really worked in the morning time like that to even get – to even play with her like that.  She come in at 10 o'clock.  It was already four people there when she get there.

Q. When you were alone in the store with her –

A. Right.

Q. – was that consistent with the way you talked?

A. No, sir.  Just that day.

*     *     *

Q. Didn't you earlier say that that tape recording was consistent with the way y'all talked –

A. Yes, on the phone and stuff, not – not in the store.

- 14 -

Q. Okay. So in the store – you never used any language like that except that one day?

A. That I – that I recall, yes, sir. Because *she came in talking about sex and stuff. Then she started to record.* She had been there over an hour when she started recording. *An hour and a half she just started playing and talking nasty, and then she hit the recorder.*

(Emphasis added.)

Regarding what did or did not happen in the ladies' rest room, the trial court found, "I can't decide who is telling the truth on that" and "the evidence is equally balanced on that issue." As a consequent of its indecision on this point, the court held that "plaintiff has failed to carry her burden of proof on that."

Ultimately, as already stated, the trial court found that plaintiff did not prove that the sexual interaction between her and Rogers was unwanted.[1] This decision was inescapably dependent on the trial court's observation and assessment of the demeanor and credibility of the various witnesses. The trial court made numerous specific findings of credibility. It is a fundamental principle of appellate jurisprudence that "[w]hen a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings." ***Collins v. Howmet Corp.***, 970 S.W.2d 941, 943 (Tenn. 1998). Put another way, "trial courts are best situated to evaluate witness credibility, and appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." ***In re Joseph F.***, 492 S.W.3d 690, 702 (Tenn. Ct. App. 2016), quoting ***Wells v. Tenn. Bd. of Regents***, 9 S.W.3d 779, 783 (Tenn. 1999) (internal quotation marks omitted). We affirm the trial court's ruling that plaintiff failed to prove that Rogers harassed her, because the interaction between the two was not unwelcomed.

---

[1] Plaintiff asserts, in an argument raised for the first time in her appellate reply brief, that the trial court did not apply the correct legal standard because it referred at times to an issue of whether the conduct was "consensual," as opposed to "wanted" or "welcomed." The trial court did use the term "consensual" occasionally in the course of delivering its long oral opinion, but often in the context of what Rogers testified to, or how he described what happened. Plaintiff argues that the trial court's ruling makes it difficult "to know whether [it] understood the correct standard to apply for determining sexual harassment, which is based upon welcome and unwelcome behavior." But in delivering its opinion, the trial court expressly stated, no fewer than seven separate times, its finding that the conduct was either "welcomed" or "not unwelcomed." We find this argument is without merit.

## C.

An employer is strictly liable for sexual harassment perpetrated by its managerial employee under *respondeat superior* if a tangible employment action has been taken against the plaintiff. *Parker*, 2 S.W.3d at 176; *Pa. State Police v. Suders*, 542 U.S. 129, 137 (2004). In *Allen v. McPhee*, 240 S.W.3d at 812-13, the Tennessee Supreme Court restated and explained the concept of "tangible employment action," and the affirmative defense available if such an action has not been taken, as follows:

> The United States Supreme Court developed the modern framework for determining an employer's liability for hostile work environment sexual harassment in the companion cases of *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Those cases held that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257. There is, however, an important exception to the rule of vicarious liability:
>
> > When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. . . . The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.
>
> *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257. In accordance with the policy of maintaining the continuity of the THRA and Title VII, we have since adopted the vicarious liability rule and the *Faragher/Ellerth* defense. *Parker*, 2 S.W.3d at 176. When

the harassing supervisor has not taken or instigated a tangible employment action against the employee, such as a termination, failure to promote, demotion, or undesirable reassignment, the employer may raise an affirmative defense to liability. *Id.*; *Faragher*, 524 U.S. at 808, 118 S.Ct. 2275; *Ellerth*, 524 U.S. at 765–66, 118 S.Ct. 2257. The affirmative defense requires the employer to establish: 1) that it took reasonable measures to prevent and correct discriminatory conduct; and 2) that the employee unreasonably failed to take advantage of these preventive and corrective measures.

In the case at bar, plaintiff alleged that Rogers instigated a tangible employment action against her by threatening to cut her hours, and carrying out that threat. As already discussed in this opinion, the trial court found the facts on this point to be adverse to plaintiff. On this point, plaintiff cited and relied upon the following proposition established in the case of *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 94 (2d Cir. 2002):

Requiring an employee to engage in *unwanted sex acts* is one of the most pernicious and oppressive forms of sexual harassment that can occur in the workplace. The Supreme Court has labeled such conduct "appalling" and "especially egregious." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). It is hardly surprising that this type of conduct – a classic quid pro quo for which courts have traditionally held employers liable – fits squarely within the definition of "tangible employment action" that the Supreme Court announced in *Faragher* and *Ellerth*.

(Emphasis added). Plaintiff also relies on *Holly D. v. Cal. Instit. of Tech.*, 339 F.3d 1158, 1173 (9th Cir. 2003), wherein the Court stated:

Like the Third Circuit, we fully agree with *Jin*. We join the Second Circuit in holding that, in addition to those acts explicitly mentioned in *Ellerth*, a "tangible employment action" occurs when a supervisor extorts sexual favors from an employee by conditioning her continued employment on her participation in *unwelcome sexual acts*. Thus, a *Faragher/Ellerth* affirmative defense is not available to the employer, whether the supervisor who abuses his supervisorial authority succeeds in coercing an employee to

- 17 -

engage in sexual acts by threats of discharge, or fails in his efforts to coerce the employee and then actually discharges her on account of her refusal to submit to his demands. Either way, the abuse of supervisorial authority results in a "tangible employment action" that causes significant injury to the employee involved.

(Emphasis added).

In a pretrial ruling on employer's motion in limine, the trial court stated it "interprets this motion as a request for the Court to reject the holding set forth in *Jin*" and granted the motion. Upon a request for reconsideration of this ruling, the trial court said, "I know there's a split in the circuits on that issue." As plaintiff correctly points out, there is no split of authority among the circuits of the U.S. Court of Appeals. At least three federal circuits follow *Jin*. *Jin*, 310 F.3d at 94; *Holly D.*, 339 F.3d at 1171-73; *Suders v. Easton*, 325 F.3d 432, 458-59 (3rd Cir. 2003), reversed on other grounds by *Pa. State Police*, 542 U.S. 129 (2004). Some federal district courts have criticized and declined to follow *Jin*. *See, e.g., Santiero v. Denny's Restaurant Store,* 786 F.Supp.2d 1228, 1235 (S.D. Tex. 2011); *Speaks v. City of Lakeland*, 315 F.Supp.2d 1217, 1225-26 (M.D. Fla. 2004); *Doe v. Lansal, Inc.*, No. 08 CV 5983, 2009 WL 5166224, at *4-6 (N.D. Ill. 2009). In this case, the trial court stated that it "adopts the holding and reasoning in the case of *Jane Doe v. Lansal, Inc.*"

On appeal, plaintiff argues that the trial court erred as a matter of law in this ruling, and urges that we adopt *Jin* and *Holly D.* as applicable in Tennessee. This question, however, is moot in this case, given the trial court's factual findings. Even assuming that *Jin* applies in Tennessee, which we do not decide, plaintiff could not prevail, because she could not establish the factual predicates to liability as discussed in *Jin* and *Holly D.* In other words, she was unable to show that Rogers "require[d] [her] to engage in unwanted sex acts," *Jin*, 310 F.3d at 94, or that he "condition[ed] her continued employment on her participation in unwelcome sexual acts." *Holly D.*, 339 F.3d at 1173. Under these circumstances, we decline to issue an advisory opinion on whether *Jin* and *Holly D.* should be adopted and followed in Tennessee. *See State v. Brown & Williamson Tobacco Corp.* 18 S.W.3d 186, 192 (Tenn. 2000) (observing "the established rule that courts are not to render advisory opinions").

In its alternative ruling, the trial court held that employer met its burden to establish its affirmative defense by proving that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and . . . that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Allen*, 240 S.W.3d at 813.

Because plaintiff failed to establish her case of sexual harassment by showing the alleged conduct was unwanted, there is no liability – direct or vicarious – and therefore the affirmative defense issue is largely moot as well. As an alternative holding, however, we affirm the trial court's ruling that employer established its affirmative defense, and will briefly summarize the evidence supporting it.

Employer provided extensive evidence of its sexual harassment policy and how it was communicated to its employees and enforced. It is contained in the employee handbook, which is given to all new employees. Although plaintiff testified she had never seen it, she signed a form on the back page of a handbook acknowledging that she received a copy of the employee handbook and "reviewed the policies and procedures contained therein." There were several printed posters outlining the policy forbidding sexual harassment and the means for employees to report it at the TSU Wendy's restaurant. The sexual harassment policy, and the means for reporting violations of it, were readily available to plaintiff. The testimony of the three executive-level managers, who testified that the first time they became aware of plaintiff's allegation was their receipt of the notice of her lawsuit, is undisputed. District manager Bobby Moss testified that he was in the store several times a week, that he knew plaintiff and had spoken with her. He testified that he was often available to hear potential complaints of sexual harassment. The trial court found that there were "many opportunities to report sexual harassment if it was going on." The evidence does not preponderate against this finding. Although plaintiff testified that she did not know that Moss was the district manager — and, hence, above general manager Rogers — her testimony was contradicted by that of numerous co-workers, and her own deposition testimony. The trial court found, "I think the company followed their anti-sexual harassment policy as best they could with no report being made."

Employer initiated a prompt and serious investigation almost immediately after it learned of plaintiff's complaint. The employee interviews yielded no corroborating evidence suggesting that any other employee had witnessed or was aware of any harassing behavior by Rogers. When Rogers came forward and told them his version of what happened in the ladies' rest room, employer effectively ended his employment on the spot, taking his keys and telling him not to return in an official capacity. When plaintiff requested a transfer to the Charlotte Pike Wendy's, employer complied with the request, and plaintiff continued to work there until her voluntary resignation. In summary, the evidence does not preponderate against the trial court's alternative ruling that employer established its affirmative defense.

**D.**

The trial court allowed director of operations Charles Pastors to review and read some of the other employee's statements made during the investigatory interview. These statements, made in the course of direct examination, were generally unfavorable to plaintiff and/or her position in the harassment lawsuit. Plaintiff objected, and insists on appeal that the court erred in allowing these hearsay statements into evidence. Employer does not dispute that the trial court erred in admitting the challenged testimony. It argues that it was harmless error, citing our observation in *Citadel Investments, Inc. v. White Fox, Inc.*, No. M2003-00741-COA-R3-CV, 2005 WL 1183084, at *11 (Tenn. Ct. App., filed May 17, 2005):

> The erroneous exclusion, or admission, of evidence in a bench trial does not, standing alone, justify a reversal of the trial court's judgment. Whether or not a trial court's decision on the exclusion or admission of evidence was erroneous is only one of the questions to be determined on appeal. An essential inquiry is whether an error requires reversal. *Blackburn v. Murphy*, 737 S.W .2d 529, 533 (Tenn. 1987); *White v. Vanderbilt University*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999). A judgment should be set aside only if, after considering the entire record, an error involving a substantial right more probably than not affected the outcome of the trial or would result in prejudice to the judicial process. Tenn. R. App. P. 36(b); *Blackburn*, 737 S.W.2d at 533-34; *Scott v. Jones Bros. Constr.*, 960 S.W.2d 589, 593 (Tenn. Ct. App. 1997); *Pankow v. Mitchell*, 737 S.W.2d 293, 297 (Tenn. Ct. App. 1987). The burden to show prejudice, that the excluded or admitted evidence affected the judgment, is on the complaining party. *Coakley v. Daniels*, 840 S .W.2d 367, 371 (Tenn. Ct. App. 1992); *Bishop v. R.E.B. Equipment Serv., Inc.*, 735 S.W.2d 449, 451 (Tenn. Ct. App. 1987).

Employer relies upon the principle that "[i]f the reviewing court determines . . . that the fact the inadmissible evidence was submitted to establish is clearly established by other evidence in the case that is competent and properly admitted, the court ordinarily should hold the error harmless." *In re Estate of Smallman*, 398 S.W.3d 134, 153 (Tenn. 2013). Employer argues that "[e]ven assuming all of the evidence addressed by [plaintiff] was admitted erroneously, the facts the evidence was submitted to establish were clearly established by properly admitted evidence." This is mostly true. Pastors was allowed to relate statements made by assistant manager Martin and co-worker

Robinson. Both of these witnesses testified at trial. Their testimony included the statements at issue, and they were subject to cross-examination on these statements. Pastors read only a single statement of a co-worker who did not testify, Yolanda Lewis, who told the interviewers that plaintiff "had a mouth on her, and that she would come banging on the door and wanting her check and yelling at Ms. [Martin] to open the door and cussing at her and telling her to give her her goddamn check." This single statement, while erroneously admitted, is hardly relevant or significant in the overall context of plaintiff's case. The trial court mentioned it in a single sentence in the course of delivering its 185-page opinion, but did not attach any significance or finding of credibility to it. We do not find that this error more probably than not affected the outcome of the bench trial, or resulted in prejudice to the judicial process.

The trial court also made a passing reference to Robinson's statement, reiterated by Pastors, that Robinson had heard plaintiff say she "sold her body for cash." As previously stated, Robinson recanted that statement on cross-examination. In reviewing Robinson's testimony, the trial court stated,

> She met plaintiff when she was in the eighth grade. [Plaintiff] bragged to Ms. Robinson about selling her body for cash while they were working on the line at TSU Wendy's. Ms. Robinson overheard [plaintiff] telling another employee that statement. And I find all that to be credible testimony.

While we have no quarrel with the trial court's assessment of Robinson's credibility, the evidence preponderates against a finding that Robinson heard plaintiff saying she sold her body for cash, because Robinson herself recanted it, clarifying that it was not as much what plaintiff said as "the way she said it." Setting aside Robinson's recanted statement, the evidence viewed in its entirety does not preponderate against the trial court's findings and judgment.

## E.

Plaintiff argues that the trial court erred in granting employer's motions in limine to exclude evidence of a prior sexual harassment lawsuit filed against employer that did not involve the TSU Wendy's or any of its employees, and to exclude evidence of Rogers' prior consensual sexual relationship with another subordinate employee. As regards these issues, plaintiff states in her brief:

> It is Plaintiff's position that the issues raised in this section are error, although for purposes of this appeal they are, in all likelihood, harmless error. In the event of remand, however,

Plaintiff would appreciate this Court's guidance for a subsequent trial court hearing.

Regarding the previous lawsuit, evidence was presented to the court notwithstanding its ruling on the motion in limine. The trial court stated the following:

> Trial Exhibit 33 is the complaint in the [prior] case versus B.F. Nashville that has now been marked as a substantive exhibit, and I have looked at it and given it the consideration that I've stated. It's the fact that another complaint occurred of sexual harassment, and only the second lawsuit for sexual harassment in the 16 plus years that Wendy's B.F. Nashville has been in existence, and I find that to be a very good record on lack of sexual harassment in the workplace. And, again, it . . . shows their sexual harassment policy is working.

Plaintiff insisted on presenting evidence of the prior lawsuit, and employer responded with undisputed testimony that it, a company owning and operating 62 Wendy's restaurants and employing between 1,500 and 1,600 people at the time of trial, had only one other sexual harassment lawsuit filed against it in sixteen years. The fact that the trial court stated that the prior complaint "has now been marked as a substantive exhibit" suggests that the trial court may have in effect reversed itself on the ruling on the motion in limine plaintiff now argues is error. If there was error in the court's handling of this issue, it was harmless.

Similarly to the prior lawsuit issue, the issue of the admissibility and effect of manager Rogers' prior romantic/sexual relationship with a subordinate can fairly be said to have been tried by implied consent. The trial court allowed and considered extensive evidence of this relationship. Rogers had a consensual relationship with a subordinate employee that resulted in the two parenting a child. The trial court credited evidence presented by employer that it was unaware of Rogers' violation of its anti-fraternization policy until after one or both of the employees no longer worked for employer. We find no error in the trial court's handling of this issue.

Employer argues that this appeal is frivolous. We do not find it to be a frivolous appeal.

## V.

The judgment of the trial court is affirmed. Costs on appeal are assessed to the appellant, Tysheka Barnett. The case is remanded for collection of costs below, in accordance with applicable law.

_____
CHARLES D. SUSANO, JR., JUDGE