IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 12, 2020 Session

## KELLY L. PHELPS v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Davidson County**
**No. 18C479    Thomas W. Brothers, Judge**

_____

### No. M2020-00570-COA-R3-CV

_____

Plaintiff Kelly Phelps brought this action for sexual harassment, discrimination, and retaliation under the Tennessee Human Rights Act ("THRA") against her employer, the State of Tennessee.  Plaintiff worked as a server at the restaurant at Paris Landing State Park ("the park").  She alleged that Josh Walsh, the assistant park manager who was described as "second in command" at the park, sexually assaulted her at an "after-party" on State property that immediately followed a Halloween party hosted by the park at the restaurant and inn.  She further alleged that after she reported the incident, Defendant, among other retaliatory actions, allowed Walsh to continue working around her at the park as usual, and to continue harassing and threatening her.  Following extensive discovery, Defendant moved for summary judgment.  The trial court found that there were genuine issues of material fact as to whether Walsh was Plaintiff's supervisor; whether he "sexually harassed women at Paris Landing State Park prior to the Halloween party" and Defendant was aware of it; and whether "a reasonable fact-finder could conclude that Mr. Walsh's action in grabbing [Plaintiff] by the neck and thrusting his body against her in a sexual manner was 'extremely serious' and sufficient to impose liability on the Defendant." However, the trial court granted summary judgment to Defendant because it found that the sexual assault did not occur "in the workplace."  Regarding the retaliation claim, the trial court held that Plaintiff did not establish that Defendant took a "materially adverse action" against her after she reported the assault.  We hold that there are genuine issues of material fact regarding whether the alleged harassment and discrimination affected a term, condition, or privilege of Plaintiff's employment, and whether Defendant unlawfully retaliated against her.  We vacate the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Vacated;**
**Case Remanded**

1

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and JOHN W. MCCLARTY, J., joined.

Jason A. Lee and Laura E. Bassett, Nashville, Tennessee, for the appellant, Kelly L. Phelps.

Herbert H. Slatery III, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General; and David M. Rudolph, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee.

## OPINION

### I. BACKGROUND

The Halloween party was planned and thrown by the park's restaurant managers on October 21, 2017. It was open to the public, and park employees were strongly encouraged to attend in costume. The party was adults-only because the restaurant's bar was open and alcohol was served in abundance. Restaurant managers gave out buy-one-get-one-free drink coupons to employees. Most of the party attendees were park employees. The trial court found that "Mr. Walsh allegedly became intoxicated. He then proceeded to grope, molest, and make uncomfortable at least five women at the party." Four State employees −Plaintiff, her fellow servers Christen Patterson and Magan Davis, and room clerk Alison Otelo −subsequently filed reports with Defendant complaining of sexual harassment by Walsh that evening. One of them, Patterson, later filed a lawsuit at the same time as Plaintiff.

Plaintiff and Patterson filed many joint pleadings, conducted discovery together, and made many of the same arguments before the trial court. Although numerous pleadings and memoranda filed below state that the cases were consolidated, there is no order to that effect in the record. Both parties recognize on appeal that Plaintiff's and Patterson's cases were not officially consolidated. The trial court's final order disposes of both cases together. The trial court denied summary judgment in Patterson's action because some of her alleged harassment took place at the party, in or around the park restaurant. The trial court found as follows:

> As to the specific allegations of Plaintiff Patterson, Mr. Walsh put his hands on and rubbed her thighs. He also asked to frisk her while placing his hands on her ribcage. At one point he pinned her against the wall making her uncomfortable. He then stopped her as she was coming out of the bathroom and asked her to perform oral sex on him. Later, he told her that he wanted to have sex with her.

2

This was not the first time Mr. Walsh had acted inappropriately with Patterson. On numerous previous occasions he had touched her on her back and ribcage, as well as several hugs. Mr. Walsh had also behaved inappropriately with other women prior to the Halloween party. Complaints had been made about him by other women prior to the Halloween party.

(Citations to record omitted).

The Halloween party ended after midnight. Keith Littles, a building maintenance worker employed at the park, invited some of the employees to his residence for an after-party. The attendees went directly to his residence, which was located on park property about a block and a half away from the restaurant and inn. According to Plaintiff's complaint, at the after-party, Walsh

approached the Plaintiff and put his arm around her neck and pulled her body into his pelvis. He had a semi-erect penis and he pressed his penis into the Plaintiff's buttocks and rubbed and thrust his penis into her buttocks area. The Plaintiff physically moved Josh Walsh away from her body. She then verbally instructed Josh Walsh to cease this activity immediately and told him to "go home to your wife." He then, a second time, grabbed the Plaintiff around the neck, pulled her in and rubbed his semi-erect penis against her buttocks and thrusted his penis in a sexual manner, into the Plaintiff. The Plaintiff was distraught, outraged and completely distressed over the actions of the assistant park manager[.]

According to the trial court's final order,

After the party, complaints were made regarding Mr. Walsh's behavior. Joan Williams, the head park manager[,] blamed the women and suggested that Mr. Walsh's behavior was acceptable. Ms. Williams did not immediately remove Mr. Walsh from his duties after the complaints were filed. He was allowed to continue being around the women who had filed complaints against him.

Eventually, on January 31, 2018, Mr. Walsh was placed on administrative leave with pay, pending formal disciplinary action more than two weeks later. On February 20, 2018, Mr. Walsh began serving a ten-day suspension without pay for his misconduct. When he came back to work, it was in a demoted position. On April 13, 2018, he resigned his employment with the State.

(Citations to record omitted).

Plaintiff filed a sworn declaration in which she alleged as follows, in pertinent part:

Following my report on November 17, 2017 about Josh Walsh's actions directed at me, he continued to work around me in the restaurant area. There was no apparent separation between Josh Walsh and myself or Christen Patterson. Josh Walsh would stare at me and Christen Patterson from the balcony. From November 17, 2017 through January 31, 2018 Josh Walsh would stare at me, smirk at me and smile at me in an intimidating, harassing, hostile manner.

The State of Tennessee did nothing to separate Josh Walsh from me and I reported his conduct to my managers, Sara Byrd and Alicia Brewer[,] on multiple occasions of Josh Walsh's actions directed at me in retaliation and harassing following my reports of sexual harassment. Josh Walsh drove by my home on multiple occasions to intimidate and stare at me during the "investigation" being performed by the State of Tennessee after I reported the sexual harassment and before he was placed on administrative leave. I reported this to my managers, and nothing was done to stop this activity.

Management at the State of Tennessee retaliated against me for my reports of sexual harassment and reduced my work hours, work shifts and the type of shifts that I was getting so that I was not given as favorable shifts to work which were less profitable and impacted me [from] a monetary perspective.

(Numbering in original omitted).

Plaintiff also alleged that as further retaliation, Defendant unfairly singled her out for written discipline resulting from its determination that her Halloween costume was inappropriate. Defendant moved for summary judgment in both Patterson's case and the current case. Among other things, the parties filed the entire depositions of fourteen witnesses in support of, and opposition to, summary judgment. The trial court stated as follows in its order granting summary judgment:

[T]he Court finds there that there is a genuine dispute of material fact as to whether Mr. Walsh was a supervisor. Even if Mr. Walsh was just a "co-worker," the Court also finds that there is a genuine dispute as [to] whether Defendant knew or should have known of the harassment and failed to take immediate and appropriate corrective action.

There is evidence that Josh Walsh sexually harassed women at Paris Landing State Park prior to the Halloween party, including Magan Davis, Sara Byrd, and Plaintiff Patterson. He would also get physically close to the women

4

who worked in the restaurant in a sexually harassing way, which was known, experienced by, and encouraged by manager Sara [Byrd]. Park manager Bridget Lofgren also experienced sexual harassment in 2017, when Walsh tried to get her to sit on his lap, and sent her 50+ texts of a sexual nature. Ranger Amy O'Brien also experienced sexually explicit comments.

The Court finds that there is a genuine dispute as to whether Defendant knew about all of Walsh's behavior before the Halloween party and had a duty to take prompt and appropriate remedial action, reasonably calculated to terminate the harassment.

(Citations in original omitted).

The trial court denied summary judgment in Patterson's action, finding among other things that "a reasonable fact-finder could conclude that the frequency, severity, and threatening nature of all of the actions of Mr. Walsh, . . . establishes that Plaintiff Patterson's workplace was permeated with discriminatory ridicule and insult that was sufficiently severe or pervasive to alter the conditions of her employment." Conversely, the court granted summary judgment against Plaintiff, on the following stated ground:

The THRA prohibits sexual harassment and discrimination ***in the workplace***. *Spann v. Abraham*, 36 S.W.3d 452 (Tenn. Ct. App. 1999). By Plaintiff Kelly Phelps' own admission, Mr. Walsh did not sexually harass her at the Halloween party. Rather, the alleged harassment occurred at an after-party at the residence of Keith Littles.

The Court finds that Defendant cannot be liable for the actions of Mr. Walsh on the private property of Keith Littles. There is no proof that employees were required to attend the after-party[;] instead it was a social gathering unconnected to work. Respectfully, the Court finds that there are no genuine issues of material fact concerning this essential element and that the [D]efendant is entitled to judgment as a matter of law as to [Plaintiff's] sexual harassment and sexual discrimination claim under the THRA.

(Emphasis in original; citations omitted).

## II. ISSUES

The issue raised by Plaintiff, as restated, is whether the trial court erred in granting Defendant summary judgment on Plaintiff's THRA claims of sexual harassment, discrimination and retaliation.

## III. STANDARD OF REVIEW

A trial court may grant summary judgment only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. The propriety of a trial court's summary judgment decision presents a question of law, which we review de novo with no presumption of correctness. *Kershaw v. Levy*, 583 S.W.3d 544, 547 (Tenn. 2019).

"The moving party has the ultimate burden of persuading the court that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." *Martin v. Norfolk S. Ry.*, 271 S.W.3d 76, 83 (Tenn. 2008). As our Supreme Court has instructed,

> when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense.

*Rye v. Women's Care Ctr. of Memphis*, 477 S.W.3d 235, 264 (Tenn. 2015) (emphasis in original). "[I]f the moving party bears the burden of proof on the challenged claim at trial, that party must produce at the summary judgment stage evidence that, if uncontroverted at trial, would entitle it to a directed verdict." *TWB Architects, Inc. v. Braxton, LLC*, 578 S.W.3d 879, 888 (Tenn. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 331, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

When a party files and properly supports a motion for summary judgment as provided in Rule 56, "to survive summary judgment, the nonmoving party may not rest upon the mere allegations or denials of its pleading, but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, set forth specific facts . . . showing that there is a genuine issue for trial." *Rye*, 477 S.W.3d at 265 (internal quotation marks and brackets in original omitted). "Whether the nonmoving party is a plaintiff or a defendant—and whether or not the nonmoving party bears the burden of proof at trial on the challenged claim or defense—at the summary judgment stage, '[t]he nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party.'" *TWB Architects*, 578 S.W.3d at 889 (quoting *Rye*, 477 S.W.3d at 265).

In reviewing the trial court's summary judgment decision, we accept the evidence presented by the nonmoving party (in this case, Plaintiff) as true; allow all reasonable inferences in her favor; and "resolve any doubts about the existence of a genuine issue of

6

material fact in favor of" Plaintiff, the party opposing summary judgment. *Id.* at 887.

## IV. ANALYSIS

### A. Sexual Harassment and Discrimination Claims

The THRA provides that it is unlawful for an employer "to discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's race, creed, color, religion, sex, age or national origin." Tenn. Code Ann. § 4-21-401(a)(1). The THRA applies to "claims of discrimination based on the existence of a hostile work environment." *Campbell v Fla. Steel Corp.*, 919 S.W.2d 26, 31 (Tenn. 1996). As our Supreme Court stated in *Campbell*,

> Hostile work environment harassment occurs "where conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Meritor* [*Sav. Bank, FSB v. Vinson*], 477 U.S. [57,] 65, 106 S.Ct. [2399,] 2404 [1986].
>
> To prevail on a hostile work environment claim in a sexual harassment case, an employee must assert and prove that (1) the employee is a member of a protected class; (2) the employee was subjected to unwelcomed sexual harassment; (3) the harassment occurred because of the employee's gender; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew, or should have known of the harassment and failed to respond with prompt and appropriate corrective action.

*Id.* (internal quotation marks omitted). Three years after *Campbell*, the Tennessee Supreme Court, in response to a pair of landmark United States Supreme Court opinions, *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), stated, "[w]e . . . adopt the [U.S.] Supreme Court's recently articulated standard of vicarious liability in all supervisor sexual harassment cases," holding:

> under the THRA, an employer is subject to vicarious liability to a victimized employee for actionable hostile work environment sexual harassment by a supervisor with immediate (or successively higher) authority over the employee. The defending employer may raise an affirmative defense to liability or damages when no tangible employment action has been taken. The affirmative defense is comprised of two necessary elements: (1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities

7

provided by the employer or that the employee unreasonably failed to otherwise avoid the harm. The affirmative defense shall not be available to the employer when the supervisor's sexual harassment has culminated in a tangible employment action.

*Parker v. Warren Cnty. Util. Dist.*, 2 S.W.3d 170, 176 (Tenn. 1999); *see also Allen v. McPhee*, 240 S.W.3d 803, 812 (Tenn. 2007), *abrogated on other grounds by Gossett v. Tractor Supply Co.*, 320 S.W.3d 777, 784 (Tenn. 2010).

Appellate courts in Tennessee have frequently observed that in enacting the THRA, our General Assembly "intended to be coextensive with federal law," including Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3. *Parker*, 2 S.W.3d at 172; *McClellan v. Bd. of Regents of State Univ.*, 921 S.W.2d 684, 691 (Tenn. 1996) ("we turn, as we often have in cases under our state's Human Rights Act, to Title VII"); *Campbell*, 919 S.W.2d at 31 ("Our analysis of the issues . . . is the same under both the [THRA] and Title VII"); *Allen*, 240 S.W.3d at 812; *Ferguson v. Middle Tenn. State Univ.*, 451 S.W.3d 375, 381 (Tenn. 2014) ("Generally, we interpret the THRA similarly, if not identically, to Title VII, but we are not obligated to follow and we are not limited by federal law when interpreting the THRA."). Consequently, in construing and applying the THRA, decisions of our sister federal courts addressing similar issues under Title VII are helpful as potentially persuasive authority. *Id.*; *Spann v. Abraham*, 36 S.W.3d 452, 463 (Tenn. Ct. App. 1999) ("Tennessee courts may appropriately look to decisions of federal courts construing Title VII when analyzing claims under the Act"). In *Ferguson*, our Supreme Court instructed that "[l]ike Title VII, the THRA is a remedial piece of legislation that should be construed liberally." 451 S.W.3d at 381.

The issue in this case is whether Plaintiff has shown a genuine issue of material fact as to whether "the harassment affected a term, condition, or privilege of employment," which is element (4) as stated by the *Campbell* Court and quoted above. This element is derived directly from the language of the THRA itself. *See* Tenn. Code Ann. § 4-21-401(a)(1). The U.S. Supreme Court has formulated an identical test under Title VII, stating, "[t]he phrase 'terms, conditions, or privileges of employment'" evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment." *Meritor*, 477 U.S. at 64; *accord Harris v. Forklift Sys, Inc.*, 510 U.S. 17, 21 (1993).

The trial court held that "the . . . issue with Plaintiff Phelps' claim is the location where the event happened. The THRA prohibits sexual harassment and discrimination ***in the workplace***." (Emphasis in original). The court concluded that "there are no genuine issues of material fact concerning this essential element." In *Spann v. Abraham*, the case cited and relied upon by the trial court, this Court stated, "[r]ather than prohibiting all verbal or physical harassment in the workplace, Title VII prohibits discrimination in the

workplace based on gender." 36 S.W.3d at 466. On other occasions, our Courts, in similar dicta, have described the THRA in such broad and general terms. *See Anderson v. Save-A-Lot, Ltd.*, 989 S.W.2d 277, 289 (Tenn. 1999) ("the THRA . . . is designed to fully compensate victims of sexual harassment in the workplace"); *Frye v. St. Thomas Health Servs.*, 227 S.W.3d 595, 603 (Tenn. Ct. App. 2007) ("If there is harassment in the work place, the burden is on the plaintiff to establish that such harassment is based upon [a] protected class characteristic that is prohibited by the civil rights statutes"); *Barnett v. B.F. Nashville, Inc.*, No. M2016-00762-COA-R3-CV, 2017 WL 2334229, at *4 (Tenn. Ct. App. May 30, 2017) ("It is well established that the THRA bars sexual harassment in the workplace").

None of these cases, however, supports the imposition of a bright-line principle that would disallow a court from considering harassing conduct that occurs away from the physical premises owned or controlled by an employer, or after traditional work hours. Further, none of the above-cited opinions addressed the issue of what constitutes "in the workplace," or more directly pertinent to the applicable test, what conduct can be considered as affecting "a term, condition, or privilege of employment," or "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Campbell*, 919 S.W.2d at 31 (quoting *Meritor*, 477 U.S. at 65).

Both the U.S. and Tennessee Supreme Court has taken a relatively expansive view of what conduct may be examined in answering these questions, adopting a "totality of the circumstances" approach:

> In determining whether an environment is hostile or abusive, a court must consider the totality of the circumstances. While no single factor is required or conclusive, considerations relevant to the determination include, but are not limited to, the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance; and the employee's psychological well-being.

*Campbell*, 919 S.W.2d at 32 (citing *Harris*, 510 U.S. at 23; internal citations omitted).

It is well established that "[i]f a single incident is severe, it may be actionable as sexual harassment despite the fact that the conduct was not repeated." *McClellan*, 921 S.W.2d at 692; *Davis v. Modine Mfg. Co.*, 979 S.W.2d 602, 606 (Tenn. Ct. App. 1998); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2nd Cir. 1995), *abrogated on other grounds* by *Ellerth*, 524 U.S. 742 ("even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment"); *Harvill v. Westward Communications, LLC*, 433 F.3d 428, 435 (5th Cir. 2005) ("'[W]e have

9

often recognized that even one act of harassment will suffice [to create a hostile work environment] if it is egregious'") (brackets in original; quoting *Worth v. Tyer*, 276 F.3d 249, 268 (7th Cir. 2001)); *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1072 (10th Cir. 1998) (disagreeing "with defendants' assertions that a single incident of physically threatening conduct can never be sufficient to create an abusive environment"). The trial court held that a reasonable fact-finder could conclude that Walsh's two serial sexual assaults against Plaintiff at the after-party were "extremely serious and sufficient to impose liability on Defendant." We agree. *See*, *e.g.*, *Smith v. Rock-Tenn Servs.*, *Inc.*, 813 F.3d 298, 310 (6th Cir. 2016) ("Like several of our fellow circuits, we consider whether harassment was so severe and pervasive as to constitute a hostile work environment to be 'quintessentially a question of fact'").

Tennessee courts have not had occasion to directly address the circumstances under which an employer might be liable for sexually harassing conduct by a supervisor or co-worker that occurred off-premises and/or after work hours. But federal courts construing Title VII have. In *Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128 (1st Cir. 2001), the plaintiff flight attendant was raped by a co-worker in a hotel in Italy during an overnight layover between flights. The trial court in *Ferris* held that the assault could not be found to have occurred in the "work environment" as a matter of law. *Id.* at 135. The First Circuit disagreed, stating in pertinent part:

> In our view, the rape could be found to have occurred in a work environment within the meaning of Title VII. The circumstances that surround the lodging of an airline's flight crew during a brief layover in a foreign country in a block of hotel rooms booked and paid for by the employer are very different from those that arise when stationary employees go home at the close of their normal workday. . . . Although it is not mandatory for them to do so, they generally stay in a block of hotel rooms that the airline reserves for them and pays for. The airline in addition provides them as a group with ground transportation by van from the airport to the hotel on arrival, and back at the time for departure. It is likely furthermore in those circumstances that the crew members . . . will band together for society and socialize as a matter of course in one another's hotel rooms. Even though the employer does not direct its employees as to how to spend their off-duty hours, the circumstances of the employment tend to compel these results. In view of the special set of circumstances that surround such a foreign layover, we disagree with the district court's conclusion. A jury could properly find on these facts that Young's hotel room was a part of Ferris's work environment within the terms of Title VII.

*Id.* In *Crowley v. L.L.Bean, Inc.*, 303 F.3d 387, 409 (1st Cir. 2002), the court considered "non-workplace conduct" of a co-worker at office Christmas and pool parties, a bar, and the plaintiff's home. The *Crowley* Court stated:

> Courts . . . do permit evidence of non-workplace conduct to help determine the severity and pervasiveness of the hostility in the workplace as well as to establish that the conduct was motivated by gender. . . . In this case, Juhl's intimidating behavior and hostile interactions with Crowley outside of work help explain why she was so frightened of Juhl and why his constant presence around her at work created a hostile work environment.

*Id.* at 409-10.

In *Tomka*, 66 F.3d at 1301-02, the Second Circuit considered events occurring at a pair of dinners attended by employees who were travelling on business. The plaintiff alleged that at the first dinner, her supervisor "encouraged his subordinates to drink, and that he directed the conversation to 'vulgar accounts of his exploitation of women.'" *Id.* at 1301. At the second dinner, which took place at a Holiday Inn, the supervisor "repeatedly ordered drinks for Tomka and insisted that she drink with the others," and he and two other co-workers "repeatedly made vulgar remarks about women and talked of past sexual exploits." *Id.* at 1302. The bar tab showed "approximately forty drinks and only a small quantity of food." *Id.* After the dinner, the plaintiff's supervisor and two other co-workers allegedly raped her in the supervisor's car. *Id.* The district court granted summary judgment to the employer on the grounds that the plaintiff failed to "show some nexus between the work environment and the sexual conduct." *Id.* at 1303. The Circuit Court reversed, considering the plaintiff's testimony that the "dinner was a business meeting convened by [the supervisor] which she felt compelled to attend." *Id.* at 1306. The Court also cited the plaintiff's testimony that "she felt forced to drink during the dinner in order to be accepted," observed that the supervisor charged the many drinks to the company credit card, and concluded:

> Of course, there is contradictory evidence in the record that the dinner was simply a social event which Tomka chose to attend and that her consumption of alcohol was likewise voluntary. . . . These issues, however, are for the fact finder. As discussed above, Tomka has presented sufficient evidence to create an inference that Lucey used his apparent authority to convene the December 6 dinner and encourage the free use of alcohol. If the trier of fact were to credit Tomka's testimony that the December 6 dinner was in fact a business meeting convened by Lucey, and that he used his apparent authority to foster the excessive drinking, this would provide the required nexus between that event and the alleged assaults which followed. In short, Tomka has created a series of reasonable inferences that Lucey used his apparent

11

authority to convene the dinner and encourage the drinking which enabled the defendants to rape Tomka.

*Id.* at 1307.

In *Duggins v. Steak 'n Shake, Inc.*, 3 Fed. App'x. 302 (6th Cir. 2001), the Court considered an alleged rape of an employee by a supervisor that occurred at a private party at the supervisor's apartment. The Court examined the nexus between the workplace and the party and found insufficient connections to impose liability on the employer, considering the following factors: (1) "Although [the supervisor] was an employee of Steak 'n Shake, Plaintiff never worked at the same restaurant with him and never worked under his supervision," 3 Fed. Appx. at 306; (2) "Plaintiff was not required to attend this party as part of her job and no manager instructed or encouraged her to attend the party," *id.*; (3) "Plaintiff did not report the alleged rape to the police, nor . . . did [she] talk to anyone at Steak 'n Shake about the alleged rape," *id.*; and (4) "after the rape, she had contact with [the supervisor] on only three occasions, none of which were at Steak 'n Shake." *Id.*

In *Doe v. Oberweis Dairy*, 456 F.3d 704, 716 (7th Cir. 2006), the Seventh Circuit considered a statutory rape of an employee by a supervisor at his apartment, analyzing the question of whether "the connection to the workplace [was] too attenuated to constitute workplace harassment" as follows:

Title VII is limited to employment discrimination, and therefore sexual harassment is actionable under the statute only when it affects the plaintiff's conditions of employment.

The sexual act need not be committed in the workplace, however, to have consequences there. . . . But at the very least the harassment must, as in *Meritor*, be an episode in a relationship that began and grew in the workplace.

\*          \*          \*

The relationship began with flirtatious talk and erotic touching in the workplace and continued there for nine months before Nayman and Doe had sex. Nor did it end with their sexual encounter. She continued working at the ice cream parlor in close proximity with her harasser—indeed under his supervision—after the statutory rape, though for less than two weeks. Because her consent to have sex with Nayman was, as a matter of law, ineffectual, this is a case of a worker subjected to nonconsensual sex by a supervisor or at least quasi-supervisor . . . during, as well as arising from, the employment relation. That is a sufficiently strong case of workplace sexual harassment to withstand summary judgment.

12

456 F.3d at 715-16 (internal citations omitted).

The Eighth Circuit took a similar approach in the case of *Dowd v. United Steelworkers of Am.*, 253 F.3d 1093 (8th Cir. 2001), stating,

> According to the union, since the conduct took place on public property in front of the plant instead of inside the plant, during work hours, it could not create "an abusive working environment." . . . The union places too much importance on the time and place of the offensive conduct instead of the nature and manner of the offensive conduct.
>
>            \*                \*               \*
>
> Moreover, the union construes "working environment" too narrowly. The offensive conduct does not necessarily have to transpire at the workplace in order for a juror reasonably to conclude that it created a hostile working environment. We have upheld a jury verdict for a plaintiff in a sexual-harassment hostile-work-environment claim where the offensive conduct took place in a hotel, after hours, on a business trip. *See Moring v. Arkansas Dept. of Correction*, 243 F.3d 452 (8th Cir. 2001). Here, the offensive conduct was in physical proximity to the plant, and, arguably, perpetrated with the intention to intimidate and to affect the working atmosphere inside the plant. Thus, we hold a reasonable juror could have determined that the racial abuse hurled at the plaintiffs as they attempted to go to and from work was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."

253 F.3d at 1101-02; *see also Fuller v. City of Oakland*, 47 F.3d 1522, 1525-26 (9th Cir. 1995) (considering co-worker's abusive, threatening and stalking behavior during non-work hours and away from workplace to establish hostile working environment).

In *Parrish v. Sollecito*, 249 F.Supp.2d 342 (S.D.N.Y. 2003), the court comprehensively examined the "fundamental inquiry" of "[j]ust how far does the 'workplace' extend, and when and where may be found the spacial and temporal continuum of the 'work environment' encompassed within the scope of discrimination Title VII proscribes?" The court noted that to strictly construe the concept of "workplace" would "allow a harasser to pick and choose the venue for his assaults so as to not account for those that occur physically outside the workplace." *Id.* at 350-51. The *Parrish* court continued:

The employment relationship cannot be so finely and facilely parsed. It comprises multiple dimensions of time and place that cannot be mechanically confined within the precise clockwork and four walls of the office. The proper focus of sexual harassment jurisprudence is not on any particular point in time or coordinate location that rigidly affixes the employment relationship, but on the manifest conduct associated with it . . .

[A]s a practical matter an employment relationship and the employee's corresponding status, while generally commencing and grounded in what constitutes the office or plant, often carries beyond the work station's physical bounds and regular hours. . . .

In fact, employees travel and transact business while "on the road" or "in the field." They may also interact outside the office at business-related meals and social events. And they may encounter one another in external contexts not strictly stemming from or compelled by a business purpose, but to which the employment relationship may necessarily carry over by reason of circumstances that may have their origins in the workplace itself.

*Id.* at 351.

Emphasizing that the precise location of the harassing conduct "should not distract from the real focus of the misconduct: the degree to which, wherever a sexual assault occurs, its consequences may be felt in the victim's 'workplace' or 'work environment' and be brought to bear on her terms and conditions of employment," *id.*, the *Parrish* court observed as follows:

often such outside misbehavior rebounds and transposes its consequences inside the actual workplace itself. However much the transgressor chooses to minimize or dismiss an act of harassment because it allegedly happened beyond the workplace, the victim may not have the equal aplomb to leave the matter behind, to simply park her wrong and hurt outside the office. . . . [T]he effects of an offensive sexual encounter that occurs outside the office may continue to manifest internally, within the actual working environment, and reflect in the terms and conditions of employment that the victim may have to cope with day-by-day[.]

*Id.* at 352.

Among the conditions that a victim may have to deal with following an off-premises assault or other threatening behavior by a co-worker, the court in *Parrish* recognized "the ability to perform work duties satisfactorily under the stress of the episode; the

14

mortification aroused by encountering the offender on the job on a regular basis; enduring constant apprehension as to whether the aggressor's misconduct may recur at any moment, or whether the employee's response, or lack of it, ultimately will transform into a material alteration of the job: demotion, denial of promotion, even dismissal." *Id.*; *see also Echevarria v. Utitech, Inc.*, No. 3:15-cv-1840, 2017 WL 4316390, at *7 (D. Conn. Sept. 28, 2017) (quoting and applying *Parrish* in considering harassment "between co-workers, [that] happened after work hours, off-site, and at a non-company event," because, among other things, the "harassing conduct occurred during an event planned and attended by a sizable group of co-workers, including two supervisors"); *Kohutka v. Town of Hempstead*, 994 F.Supp.2d 305, 325 (E.D.N.Y. Jan. 29, 2014); *Ratliff v. U.S. Postmaster Gen'l*, No. 2:06-cv-00115, 2008 WL 11450458, at *6-7 (S.D. Ohio Feb. 1, 2008) ("numerous courts have considered out-of-work place harassment as part of the totality of the circumstances in hostile work environment cases" and "[l]ower courts have also indicated out-of-workplace harassment may be actionable"); *Cromer-Kendall v. Dist. of Columbia*, 326 F.Supp.2d 50, 58 (D.D.C. July 9, 2004); *McGuinn-Rowe v. Foster's Daily Democrat*, No. 94623-SD, 1997 WL 669965, at *3 (D.N.H. July 10, 1997).

Expounding on this last point—that harassment or assault outside of the "traditional workplace" can and often does spill over and affect the victim's workplace experiences—numerous courts have recognized that "when an employee is forced to work for, or in close proximity to, someone who is harassing her outside the workplace, the employee may reasonably perceive the work environment to be hostile." *Duggins*, 3 Fed. App'x. at 311; *Ratliff*, 2008 WL 11450458, at *6; *Oberweis Dairy*, 456 F.3d at 716 (considering as a factor that plaintiff was forced to "continue working . . . with her harasser" and supervisor after statutory rape); *Ellison v. Brady*, 924 F.2d 872, 883 (9th Cir. 1991) ("in some cases the mere presence of an employee who has engaged in particularly severe or pervasive harassment can create a hostile working environment"); *Temporali v. Rubin*, No. CIV.A. 96-5382, 1997 WL 361019, at *3 (E.D. Pa. June 20, 1997) ("Requiring the victim of sexual harassment to work under the supervision of the harasser may 'alter the conditions of the victim's employment' and create an 'abusive working environment'"); *Vanover v. White*, No. 3:07-CV-15, 2008 WL 2713711, at *10 (E.D. Tenn. July 10, 2008) (quoting *Duggins*).

As is evident from the above discussion, courts addressing whether an employer can be held liable for a supervisor or co-worker's sexual harassment occurring off-premises and/or after traditional work hours consider the totality of the circumstances, including the following factors: (1) the proximity in time and space to the "traditional workplace"; (2) the relationship of the event to the employees' work duties; (3) the extent to which the employer planned, promoted, or sponsored the event; (4) the degree to which employees were pressured or encouraged to attend the event and the number of employees in attendance; (5) the employer's knowledge of any pattern of similar harassment by the offending employee under prior similar circumstances; (6) the extent to which the off-premises harassment impacted the victim's workplace experience after it was reported to

15

the employer, including whether the victim was forced to continue working with the harasser; and (7) any other circumstances pertinent to the inquiry.

With these factors in mind, we turn to the facts of the present case. The Halloween party took place on a Saturday night, at Plaintiff's workplace, the Paris Landing State Park restaurant and inn. The party was planned and thrown by TDEC employees, Plaintiff's two direct supervisors, restaurant managers Alisha Brewer and Sara Byrd. Both Brewer and Byrd testified that they distributed buy-one-get-one-free drink vouchers to the employees. Regarding the employees, Byrd testified that "we wanted everyone there. We wanted it to be another success like the St. Patrick's Day party was because the employees were there also." She stated, "I will admit, I really encouraged them to come."

Jeff Utley, a park ranger who attended the party and after-party, confirmed that the restaurant managers were "pushing the employees to attend the party," testifying that "[t]hey were trying to get as many people to come as they could because they wanted it to be a productive event." Shana Gallion, a chef at the restaurant, testified that Byrd "told us we had to go" and "made it clear that all the employees at the restaurant had to be there." Plaintiff testified as follows:

Q: Were you required to go to this Halloween party?

A: I was not required, but I was pressured.

Q: Who pressured you?

A: Sara Byrd, mostly.

\* \* \*

Q: This was not just an event for park employees?

A: It was pushed more on park employees than it was anybody else. . . It was very strongly pushed for us to be there.

Everyone who testified about the party agreed that the great majority of attendees were park employees. Chef Gallion stated that there were "very few other outside parties." She and manager Brewer agreed that the "vast majority" were employees. Ranger Utley said, "I believe I noticed approximately six people or so that were not employees." Brandon Williams, the park ranger on duty during the party, stated, "I was supposed to work until like 1:00, 1:30, somewhere around in there. Josh [Walsh] told me to take off early because it was all pretty much employees."

16

Neither Walsh nor his multiple sexual assault victims were on the clock that night. Walsh was the highest-ranking supervisor at the party. Restaurant managers Byrd and Brewer worked until about 11:00 pm. The State provided Brewer with a complimentary room at the inn, which she opened to female employees to allow them to change into their Halloween costumes. The managers made Jell-o shots to sell at the party. Byrd testified that at the end of the party, she sold the leftover Jell-o shots in bulk at a cut rate to make a little more money and so they wouldn't go to waste. The testimony suggests, but does not conclusively establish, that these shots made their way to the after-party. The bar tab for Walsh showed fifteen alcoholic beverages that he purchased, which did not include whatever free drinks he was provided.

The after-party at maintenance worker Littles' residence took place immediately after the party. It was located one to one-and-a-half blocks from the restaurant and inn. There was no evidence or suggestion that anyone other than employees and their dates attended the after-party. Plaintiff testified that she went straight there after the party, and further testified:

Q: You're alleging . . . that the harassment happened at the after party but not at the Halloween party itself?

A: Not to myself at the Halloween party, itself, but it was a continuance of the Halloween party.

Q: And you went to Keith Littles' house after the Halloween party for the after party?

A: Yes.

\* \* \*

Q: Keith Littles lived at that time in a park residence at Paris Landing State Park?

A: Yes. During this time period I never left the state park property.

The after-party took place both outside (they had a bonfire) and inside the residence.

The next day, October 22, 2017, Plaintiff told her managers that Walsh was a "creeper" and that she didn't trust him. She stated that the managers "did not ask any follow up questions or ask me for any information about what had occurred." Over the next couple of weeks, Plaintiff learned more details about Walsh's alleged sexual assaults and harassment of the other employees. On November 17, 2017, she had a long

conversation with Brewer and Byrd, giving them a full oral report about what took place at the party and after-party. Nothing happened for four days, when Plaintiff again pressed the issue and said she wanted to file a report.

The State investigated the reports of Plaintiff and the three other employees who alleged harassment. As already noted, the trial court found that the park manager "did not immediately remove Mr. Walsh from his duties after the complaints were filed. He was allowed to continue being around the women who had filed complaints against him." Several witnesses, including fellow server Patterson, Chef Gallion, and Rangers Utley and Williams, confirmed Plaintiff's testimony that Defendant "did nothing to separate Josh Walsh from me" after Plaintiff's multiple reports of his retaliatory harassment.

These employees also testified about the apparent effect the harassment had on Plaintiff while she was working. For example, Gallion testified as follows, in pertinent part:

Q: Tell me what Josh [Walsh] started to do towards [Plaintiff] and Ms. Patterson that you actually witnessed and saw after the party.

A: Being back at work, we were in the restaurant. I'm a buffet cook. I'm cleaning the buffet. He's standing up at the balcony watching them, watching what they're doing.

Q: Would he stare at them specifically?

A: Yeah. They'd be at the tables doing silverware, doing orders, filling drinks, and he's walking back and forth watching them. Or he'd stand there and watch them like a creep.

Q: Do you recall him also being out in the parking lot waiting when they got off their shifts?

A: Yes. I had to take [Plaintiff] out every night because she was so scared to get in her car. Every night.

*　　*　　*

Q: Did it continue all the way up until Josh Walsh was out of there?

A: Yes, sir.

18

Q: So [park manager] Joan Williams said that she told Josh not to go anywhere near them. If she did tell him that, did he stop?

A: No, he did not.

Q: And you witnessed that with your own eyes?

A: Witnessed that myself.

Q: So anytime you saw him, you saw him doing this type of activity?

A: Yes, sir.

Q: And how many times a week approximately was he around there?

A: A week? If he was on shift, he was there a couple times a day.

Q: Okay. So, I mean, three to five times a week? Six to ten times a week?

A: Say more closer to ten times a week.

*     *     *

A: I cared about [Plaintiff] as far as being upset about this whole thing, and I wasn't going to let her walk out there alone when I actually seen him lurking round in the parking lot. . . . This guy wasn't making rounds. He was stalking.

*     *     *

Q: Did you ever see Ms. Patterson or [Plaintiff] have to serve Mr. Walsh in the restaurant?

A: I seen both of them have to take care of his kids. As far as him coming in to eat Friday and Saturday nights, both of them had to deal with him.

*     *     *

A: Being a friend, I seen [Plaintiff] going through depression. A lot of different emotions that she couldn't deal with at times, so she needed a friend to talk to. I mean, it really messed her up in a lot of ways. It made her

19

emotional.  She couldn't deal with things like she normally could, you know[.]

Q: Did you even have to spend the night at her house because she was so afraid sometimes?

A: Yeah.  I'd protect her either way.

Ranger Utley testified:

A: I do remember [Plaintiff] being really worried about it and coming to me and stating that, at night, she would see [Walsh's] van drive by her house and there was no reason for him to be−that's not in our patrol routes at all.  It's somewhat close, but, I mean, in my patrol rounds, I never go by her house.

Q: Right.  Do you remember her also talking to you about how he would wait out in the parking lot for her . . . when she would get off work?

A: When she would get off work and it made her very uncomfortable.  It would have made me uncomfortable too.

Q: Based on what you saw and heard from [Plaintiff] specifically[,] how would you say this affected [her] based on what you saw of her mentally and emotionally?

A: Just totally stressed about it, of course and feeling like−she felt like nothing was being taken seriously.  But it was a serious matter.  I mean, this guy carries a gun, you know.  . . .  If I would have been in her shoes, I would have been really scared.

Ranger Williams testified quite similarly.  He said that Plaintiff told him "how it made her uncomfortable, she got anxiety from it, stuff like that."

Plaintiff testified about her feelings of anxiety, anger, and depression at work.  She stated, "[t]his man knew what he did and he knew he was getting away with it.  And the State stood back and let him continue to do this to me."  She further testified that

During this whole time period I was required to work with [Walsh].  He didn't only do it to me, he did it to three other women including one of my bosses, so let's make that five.

\*     \*     \*

20

For months, I had to work with this man while he−he more or less mocked me. I mean, I don't know a better word for it other than mocked me because he knew what he was getting away with.

Walsh declined to provide his side of the story. In his deposition, he answered the basic and general "housekeeping" inquiries and a few other short questions, 51 in total. On the substantive questions about what happened before, during, and after the parties, 186 total questions, Walsh refused to answer by invoking his Fifth Amendment right against self-incrimination.

On January 31, 2018, the TDEC Commissioner sent Walsh a letter stating, "[e]ffective immediately, you are being placed on Administrative Leave with Pay pending the investigation of a recent workplace harassment incident in which you were named a participant. You are not to report to work until the investigation has concluded." The investigation had in fact already concluded with a report filed on January 8, 2018, that found that Walsh had violated the State's workplace harassment policy.

Defendant argued at the trial level and on appeal that "TDEC primarily addressed inappropriate behavior that had occurred at the park-sponsored Halloween party; TDEC concluded that it lacked authority to discipline Walsh and other employees for inappropriate behavior at the after-party because it occurred at a private residence and was not a state-sponsored event." However, on February 15, 2018, park manager Joan Williams sent letters to employees Jeff Utley and Alison Otelo, which stated in pertinent part as follows:

> This letter serves as documentation of this coaching session concerning your conduct that was unbecoming of a state employee. This is in association with allegations that park staff that attended an after-party at an on-park residence, [*sic*] which resulted in several *harassment complaints that have impacted the workplace*.
>
>        \*       \*       \*
>
> As a result of your unacceptable behavior, you are receiving a coaching session *concerning the activities that occurred at the after-party that were inappropriate*. . . . This is unacceptable and inappropriate conduct that requires management to address within this coaching session. Continued conduct of this nature may lead to *further disciplinary action* up to and including separation from state service.

21

(Emphasis added).  These letters show that Defendant disciplined two other employees for actions at the after-party.

Considering the totality of the circumstances, we hold that there is a sufficient nexus between the workplace and the harassment for a reasonable trier of fact to conclude that the sexual assaults perpetrated against Plaintiff, and the work situation that followed in the next few months, "affected a term, condition, or privilege of [her] employment." *Campbell*, 919 S.W.2d at 31; Tenn. Code Ann. § 4-21-401(a)(1).  A number of applicable factors favor this conclusion: the close proximity in space and time to the traditional workplace; the pressure applied to employees to attend; the roster of attendees at both parties, showing a great majority or entirety of employees; the sponsorship by Defendant of the party, including its provision of alcoholic beverages and encouragement to buy and drink them; Plaintiff's testimony that the after-party was a "continuation" of the State-sponsored party; and, as the trial court found, the "evidence that Josh Walsh sexually abused women at Paris Landing State Park prior to the Halloween party"[1] and the "genuine dispute as to whether Defendant knew about all of Walsh's behavior before the Halloween party." (Footnote added).  *See, e.g., Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 341 (6th Cir. 2008) ("An employer's responsibility to prevent future harassment is heightened where it is dealing with a known serial harasser and is therefore on clear notice that the same employee has engaged in inappropriate behavior in the past").  We vacate the trial court's summary judgment against Plaintiff on her THRA discrimination and sexual harassment claims.

## B.  Retaliation Claim

Plaintiff also alleged retaliation by Defendant against her after she reported the sexual assaults.  The THRA provides that it is a discriminatory practice to "[r]etaliate or discriminate in any manner against a person because such person has opposed a practice declared discriminatory by this chapter or because such person has made a charge, filed a complaint, testified, assisted or participated in any manner in any investigation, proceeding or hearing under this chapter."  *See* Tenn. Code Ann. § 4-21-301.  The THRA's anti-retaliation provision "prohibit[s] employer actions that are likely to deter employees from filing complaints . . . asserting their rights under anti-discrimination statutes." *Ferguson*, 451 S.W.3d at 381.  "To a large extent, the effectiveness and very legitimacy of discrimination law turns on people's ability to raise concerns about discrimination without fear of retaliation." *Id.* (internal quotation marks omitted).

As our Supreme Court has stated,

---

[1] There is also evidence in the record of Walsh's harassing behavior at other locations, including several other state parks, which also allegedly happened after he became intoxicated.

Applying *White*, [548 U.S. 53 (2006)], we hold that in order to state a prima facie case for retaliation under the THRA an employee must demonstrate: 1) that she engaged in activity protected by the THRA; 2) that the exercise of her protected rights was known to the defendant; 3) that the defendant thereafter took a materially adverse action against her; and 4) there was a causal connection between the protected activity and the materially adverse action.

*Allen*, 240 S.W.3d at 820; *Perkins v. Metro. Gov't of Nashville*, 380 S.W.3d 73, 81 (Tenn. 2012). The question presented in this case is whether Plaintiff presented a prima facie case as to the third element, whether Defendant "took a materially adverse action against her." Addressing this question, we have held that "[a] plaintiff's prima facie burden is not onerous." *Lin v. Metro. Gov't of Nashville*, No. M2008-00212-COA-R3-CV, 2008 WL 4613559, at *5 (Tenn. Ct. App. Oct. 10, 2008); *accord Hicks v. Baines*, 593 F.3d 159, 164 (2nd Cir. 2010) (to show case of discriminatory retaliation, "[t]he plaintiff's burden in this regard is '*de minimis*,' and 'the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive.'").

As the Supreme Court stated in *Ferguson*,

Federal and state courts recognize that retaliation comes in many shapes and sizes. "The law deliberately does not take a 'laundry list' approach to retaliation, because unfortunately its forms are as varied as the human imagination will permit." *Knox v. Indiana*, 93 F.3d 1327, 1334 (7th Cir. 1996). The United States Supreme Court has acknowledged that effective retaliation can take many forms. *White*, 548 U.S. at 64, 126 S.Ct. 2405.

451 S.W.3d at 381-82. In determining whether an employer's action is "materially adverse" to the employee, the *Perkins* Court applied the U.S. Supreme Court's guidance in *White* as follows:

While the [*White*] Court broadly interpreted the scope of the antiretaliation provision to "extend[ ] beyond workplace-related or employment-related retaliatory acts and harm," *id*. at 67, 126 S.Ct. 2405, the Court emphasized that the provision only protects against "retaliation that produces an injury or harm." *Id*. "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." 548 U.S. at 68, 126 S.Ct. 2405. Rather, protection extends to "employer actions that are likely to deter victims of discrimination from complaining to

23

the EEOC, the courts, and their employers." *Id.* (internal quotation marks omitted).

> The Court adopted an objective standard to differentiate petty slights from retaliatory action. *Id.* To satisfy this standard, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (internal quotation marks omitted).

380 S.W.3d at 81-82. The *White* Court recognized that

> the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.

548 U.S. at 69.

At the outset of our application of these principles to this case, we note that there is clearly an abundance of disputed material facts pertinent to Plaintiff's retaliation allegations. In response to the summary judgment motion, she filed a statement of additional material facts as allowed by Tenn. R. Civ. P. 56.03. Forty-six of these facts were under the heading, "continued hostile work environment and retaliation by Walsh, management and Tennessee−against [Plaintiff] and Patterson." They generally alleged facts about what happened following the after-party, the State investigation and response, and the ongoing harassment and stalking that Defendant allegedly allowed to continue. Of these forty-six statements, Defendant responded that only two of them were "undisputed."

Plaintiff argues that Defendant retaliated against her in several ways. Park manager Joan Williams issued Plaintiff a written warning for "conduct unbecoming of an employee in state service" for wearing an "inappropriate article of clothing" at the Halloween party. Plaintiff's costume was a "child vampire." She wore a "onesie" and an oversized bib with blood spatters on it. On the reverse side of the bib, which Plaintiff said she got at a bachelorette party, were the words "Blow Job Queen." Every employee who testified about her costume, Byrd, Brewer, Gallion, Utley, and Brandon Williams, agreed that the words were not facing outward and showing during the party. Plaintiff showed the wording on the back side of the bib to certain of her friends over the course of the evening.

It is undisputed that the Halloween party was also attended by employees dressed as "a pimp and a ho," a male porn star, a "scantily-clad referee," a "police stripper," and a

man "dressed as a woman with fake breasts."  Restaurant manager Byrd testified that Plaintiff "was more clothed than anyone there."  At some point during the party, there was a lap dance contest judged by Walsh.  No one else received a warning, or other discipline, from his or her actions or attire that night.  Several of the employees stated that they could think of no conceivable reason for Plaintiff having been singled out other than retaliation.

The trial court's only finding on this point states, "Ms. Patterson was dressed as a police officer and [Plaintiff] wore a sign that read 'Blow Job Queen.'"  This finding regarding Plaintiff's costume is inaccurate, misleading, and unsupported by the evidence.  The trial court granted summary judgment against Plaintiff on her retaliation claim on the following ground: "A written warning, without evidence that it led to a materially adverse consequence such as lowered pay, demotion, suspension, termination, is not a materially adverse action as a matter of law."  The court cited *Creggett v. Jefferson Cnty. Bd. of Educ.* 491 Fed. App'x. 561, 566 (6th Cir. 2012) in support of this proposition.  In *Hardy v. Tenn. State Univ.*, No. M2014-02450-COA-R3-CV, 2016 WL 1242659, at *29-30 (Tenn. Ct. App. Mar. 24, 2016), however, this Court considered several written warnings issued to an employee, notwithstanding that "th[e] evidence show[ed] that his direct supervisor was willing to accommodate his late schedule," and concluded that "[t]he trier of fact could find that the scrutiny of Mr. Hardy and the warnings he received was causally related to the EEOC charges he filed.  Accordingly, TSU was not entitled to summary judgment on this claim of retaliation." *Id.* at *30.

We need not resolve the question of whether Plaintiff's written warning, standing alone, would suffice to show a material issue regarding whether her employer's action was materially adverse, because she has alleged several other instances of retaliation, none of which were addressed by the trial court.  In her sworn declaration, as already stated, Plaintiff alleged:

> [Defendant] retaliated against me for my reports of sexual harassment and reduced my work hours, work shifts and the type of shifts that I was getting so that I was not given as [many] favorable shifts to work which were less profitable and impacted me [from] a monetary perspective.

Defendant disputes this allegation.  It produced Plaintiff's time sheets and argued that they showed she worked as many hours after the reports as before.  Plaintiff responds by arguing that she may have worked a similar total number of hours but that the shifts she was assigned (fewer shifts during traditional meal times), and the areas of the restaurant she was assigned to (the middle sections that were less popular with diners), resulted in fewer customers and less income from tips.  Manager Byrd, who was generally in charge of scheduling, testified that she tried to be fair to all the servers, but agreed that "probably" Plaintiff "worked less hours on Fridays than she did in the prior year."

In *Reed v. Cracker Barrel Old Country Store, Inc.*, 133 F.Supp.2d 1055, 1071 (M.D. Tenn. 2000), the court considered a similar situation, stating as follows:

> Ms. Reed's position as a server in a restaurant does not offer many opportunities for demotion, change in benefits, or decreased material responsibilities. . . . In this case, the plaintiff was required to work longer shifts, to stay beyond her scheduled shift, and to work until closing on a regular basis. Although it is difficult to imagine what a demotion or a decrease in responsibilities would involve with a server, these actions do constitute significant, negative changes in the plaintiff's work status. In addition, she suffered the economic detriment of being placed in the least desirable section of the restaurant on a regular basis. *In a profession where wage is determined almost solely by tips, the consistent decision to place the plaintiff in a section with fewer customers than anywhere else in the restaurant amounted to a decreased wage*. When taken together, the plaintiff has presented sufficient evidence to show that she suffered an adverse employment action, even prior to her termination.

(Emphasis added). Accepting Plaintiff's allegations as true and drawing reasonable inferences in her favor for summary judgment purposes, we hold that a reasonable trier of fact could conclude that Defendant took actions materially adverse to Plaintiff by altering her work schedule as alleged.

Finally, Plaintiff alleged that her supervisors knowingly allowed Walsh to continually intimidate her by staring, leering, lurking, and stalking her both during and after work hours. We have already described Walsh's alleged conduct at length above, and will not reiterate it here. Plaintiff presented testimony supporting her allegation that she reported Walsh's ongoing conduct to her managers "on multiple occasions . . . and nothing was done to stop this activity." If the trier of fact believes this proof, it could conclude that the action of Plaintiff's managers in knowingly allowing the harassment to continue was retaliatory and materially adverse. We vacate summary judgment against Plaintiff on her claim of unlawful retaliation under the THRA.

## V. CONCLUSION

The judgment of the trial court is vacated and the case remanded to the trial court. Costs on appeal are assessed to the appellee, State of Tennessee, for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE